H. Alvan Jones and Helen P. Jones, [1] Petitioners v. Commissioner. Jones v. Commissioner
Docket Nos. 2349-69, 2350-69, 2351-69, 2352-69.
United States Tax Court
T.C. Memo 1972-145; 1972 Tax Ct. Memo LEXIS 112; 31 T.C.M. (CCH) 724; T.C.M. (RIA) 72145; July 3, 1972
Charles C.W. Atwater, 402 One N. Charles St., Baltimore, Md., for the petitioners. Charles F.T. Carroll, for the respondent. ATKINS
Memorandum Findings of Fact and Opinion ATKINS, Judge: In these consolidated cases respondent determined deficiencies in petitioners' income taxes as follows: Docket
No.
Year
Deficiency
2349-69 H. Alvan Jones and
1964
$ 6,411.67
Helen P. Jones
1965
16,275.52
1966
4,501.08
2350-69 Raymond E. Lenhard and Mary N. Len- hard
1965
9,913.64
2351-69 William P. Horton and Eleanor B. Horton
1965
13,041.53
2352-69 John J. Fahey and Betty H. Fahey
1965
13,429.62
Some issues in Docekt No. 2349-69 having been settled by stipulation, the issues remaining for decision in each *114 of the cases are whether the distribution made by Eleven-O-S/even St. Paul Street, Inc., of $164,000 pro rata to the petitioner-husbands on July 19, 1965, constitutes a dividend taxable at ordinary income rates, and, if so, whether the earnings and profits of Eleven-O-Seven St. Paul Street, Inc. which were available for distribution of taxable dividends during its fiscal year ended June 30, 1966, should be reduced by a claimed casualty loss. Findings of Fact Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. The petitioners, H. Alvan Jones and Helen P. Jones, are individuals, husband and wife, who resided at Bennett Point Road, Queenstown, Maryland, 21658, at the time of the filing of their petition herein. The petitioners, Raymond E. Lenhard and Mary N. Lenhard, are individuals, husband and wife, who resided at 14 West Cold Spring Lane, baltimore, Maryland, 21210, at the time of the filing of their petition herein. The petitioners, William P. Horton and Eleanor B. Horton, are individuals, husband and wife, who resided at 115 Witherspoon Road, Baltimore, Maryland, 21212, at *115 the time of the filing of their petition herein. The petitioners, John J. Fahey and Betty H. Fahey, are individuals, husband and wife, who resided at 5306 Purlington Way, Baltimore, Maryland, 21212, at the time of the filing of their petition herein. All the petitioners filed their joint Federal income tax returns for the years in issue with the district director of internal revenue, Baltimore, Maryland, on a cash receipts and disbursements basis. The petitioners Helen P. Jones, Mary N. Lenhard, Eleanor B. Horton, and Betty H. f/ahey are petitioners herein solely because of having filed joint returns with their husbands. For convenience the husbands only will be hereinafter referred to as the petitioners. The petitioners are medical doctors conducting, as partners, the practice of orthopedic surgery. On June 19, 1962, a corporation named Eleven-O-Seven St. Paul Street, Inc., (hereinafter at times referred to as "the corporation") was formed by the petitioners. On or about June 30, 1962, petitioners Horton and Fahey each acquired 1,000 shares of stock of the corporation (a one-fourth interest to each) for the payment by each of them to the corporation of $26,348. On or about *116 June 30, 1962, petitioners Jones and Lenhard each acquired from the corporation 1,000 shares of its stock and $14,433.29 in return for the conveyance by them to the corporation of certain real property known as 1105-1107 St. Paul Street, Baltimore, Maryland, a lot improved by a four-story building. The interests in the land and building contributed by Jones and Lenhard were each recorded on the books of the corporation at a value of $14,433.29. 726 These transactions were treated by the corporation as follows: Contribution of cash
* $52,692.00
Contribution of interest in land and building
28,866.58
Capital Stock
$70,000.00
Paid in surplus
11,558.58
Petitioners Jones and Lenhard each took as his basis in the stock the amount of $14,433.29. Petitioners Fahey and Horton each took as his basis in the stock the amount of his cash contribution to the corporation or $26,348. The building transferred to the corporation, together with certain medical equipment and furniture and fixtures, were leased to the *117 medical partnership for an annual rental of approximately $18,000, and the building was used by the medical partnership as its principal office for conducting the practice of orthopedic surgery. In September 1963, the corporation sold the real property located at 1105-1107 St. Paul Street to the St. Paul at Chase Corporation (a corporation not owned by any of the petitioners directly or indirectly) for $225,000. The corporation reported long-term capital gain from this transaction in the amount of $163,638.86. On October 30, 1963, pursuant to contract of July 23, 1963, the corporation purchased land and a building located at 1117 St. Paul Street in Baltimore for $75,000. On the same date the corporation leased the premises 1117 St. Paul Street to the medical partnership for a term of 20 years to begin November 1, 1963, at an annual rental of $18,000. Also on October 30, 1963, the corporation assigned its rights in this lease to the Mercantile Safe Deposit and Trust Company to secure a mortgage on the premises. Under this assignment the leasehold interest was to be subordinate to the mortgage. The doctors then moved their medical practice into the building at 1117 St. Paul Street. *118 In May of 1964 the St. Paul at Chase Corporation, which had purchased 1107 St. Paul Street, began demolition and excavation for a large apartment building which was to be built adjacent to 1117 St. Paul Street. The method used to provide lateral support to the soil underneath the property at 1117 St. Paul Street was to drive sheet piling three feet from the south wall extending twenty-five feet into the ground below the footings of the buildings. Wales, or lateral beams, were put in to hold the sheet piling. The sequence of the operation on the adjoining property and the method used disturbed the soil below 117 St. Paul Street and caused the building to both settle and move laterally. The cause of about ninety per cent of the damage was the driving of the sheet piling. Demolition probably started a few cracks. These together with deflection in the pilings and the lateral pressure on the wall were the causes of the damage. Damage to the building on 1117 St. Paul Street began to show in the summer and fall of 1964. In the late summer of 1964 petitioners became aware of the damage to the building. In September 1964 a structural engineer, Paul Crout, and an attorney, William *119 Siskind, were consulted by the corporation, as a result of which Crout was retained as consulting engineer to study the damage to the structure, and Siskind was retained as counsel to handle its claim for damages. In a letter dated October 6, 1964, to the corporation Crout made a report of his examination of the building and recommended that a registered surveyor be employed to check the rate of settlement of the building. S.J. Martenet, a surveyor, was engaged, who took periodic measurements of the lateral movement of the building. His surveys showed that the top of the west elevation moved to the south 1 3/8inch from October 4, 1964 to October 14, 1966. It appeared that it had moved about 1 3/4inch prior to that time. Crout's letter did not state that the building was dangerous. On December 18 and 29, 1964, and April 26, 1965, reports of the Bureau of Building Inspection of the City of Baltimore were made describing the general condition of the premises. None of these reports stated that occupancy of the building was hazardous. On March 17, 1966, Crout wrote to the Building Inspection Engineer of the City of Baltimore requesting advice and opinion as to whether, even though *120 the south wall of the premises did not conform to the building code for masonry construction, 727 the City would accept it as being safe and adequate. On March 24, 1966, Crout was advised by the Building Inspection Engineer of the City of Baltimore that the condition of the south wall appeared to be safe at that time, and the Bureau would not require any rebuilding or reinforcing of the wall unless its condition should materially change. The corporation retained the Colwill Construction Company, a building concern which had originally renovated 1117 St. Paul Street for occupancy by the partnership, to estimate the cost of repairs necessary to the building as a result of settlement of the building. On April 18, 1966, the president of Colwill Construction Company wrote to Crout setting forth the opinion that the condition of the building at that time, especially as it was moving, represented a hazard to its occupants and suggested inspection by the Bureau of Building Inspection of the City of Baltimore to determine whether the building was safe. On April 25, 1966, Crout wrote a letter to Siskind stating that he had "been scanning the field to find an experienced and competent *121 engineer to render an independent opinion concerning the stability and safety of this structure." This letter enclosed a copy of Colwill's letter of April 18, 1966. In his letter Crout stated that he was forwarding the Colwill letter for possible use "as a wedge to force the Building Inspection Engineer of the City of Baltimore to make a survey of this structure." On June 30, 1966, F. Lester Simon, a consulting engineer hired by Crout, submitted his report. In this report he expressed the opinion that the premises at 1117 St. Paul Street could not be regarded as safe for continued occupancy until the movement and settlement had been shown to have ceased, and the south wall reinforced in some approved manner. On February 2, 1967, Simon further advised Crout that in view of the continued movement of the building he felt more strongly than before that the building was unsafe for occupancy and should be vacated. On February 23, 1967, the petitioner Horton wrote to the Bureau of Building Inspection of the City of Baltimore on a letterhead of the corporation stating "as owner and occupant of our building at 1117 St. Paul Street, we have been advised by qualified engineers that our *122 building is unsafe for further occupancy. Before any radical steps are taken, which would involve moving four doctors and their practices, we would like your opinion to confirm this possibility." Pursuant to that request, the Bureau of Building Inspection made an inspection on March 7, 1967, and reported that the building was not unsafe at that time. In December 1963, the corporation had invested $29,260.06 in United States Treasury obligations and $19,624.55 in stocks of various widely-held corporations. On January 1, 1964, the corporation invested $7,837.50 in the purchase of 100 shares of General Motors stock. The corporation sold all of the above stocks on June 19, 1964, and sold the Treasury obligations on June 30, 1964. Of the amount of notes receivable, $103,687.51, shown as of the end of the year (June 30, 1964) on the balance sheet attached to the corporation's return for the year ended June 30, 1965, approximately $80,000 represented a note from St. Paul at Chase Corporation, which was paid off in September 1964 during the corporation's fiscal year ended June 30, 1965. On its return for the year ended June 30, 1965, the corporation showed its balance sheet as of June 30, 1965, to *123 be as follows: Assets
Cash
$148,735.39
Notes and accounts receivable
24,990.32
Organization expense
200.00
Building (less depreciation)
78,518.18
Land 8,000.00
Total Assets
$260,443.89
Liabilities & Capital
Payroll taxes
$ 104.81
Mortgage
55,500.00
Capital Stock
70,000.00
Paid in or capital surplus
11,558.58
Earned surplus and undivided profits
23,280.55
Earned surplus and undivided profits 123,280.50
Total Liabilities and Capital
$260,443.89 The note for $24,990.32 shown on the balance sheet was a note due from petitioner Horton which was cancelled as part of a distribution made on July 19, 1965. On July 5, 1965, the corporation had excess cash which was not needed in the business. At a board of directors meeting on July 5, 1965, Rudolph E. Tighe, Jr., an attorney and certified public accountant, advised the directors, who were the four 728 petitioners, that the corporation was extremely liquid because of the sale of the old property and pointed out to them that the funds in the hands of the corporation were far beyond its immediate needs. The minutes of this Board of Directors' Meeting state in part as follows: (2) The two senior *124 partners, Doctors Lenhard and Jones, have indicated a general desire to retire from the firm in the near future. Doctor Lenhard, the senior partner, indicated that his retirement might be more immediate than that of Doctor Jones. (3) The general policy of the medical partnership and this corporation is that ownership of stock in this corporation shall be equally divided among members of said medical partnership. (4) In order for a business of like manner to provide for the general contraction in business activity of this corporation which will take place upon the retirement of Doctor Lenhard and Doctor Jones, it was agreed by all directors that it would be advisable at the present time to agree upon a plan of partial liquidation of this corporation. Mr. R.E. Tighe, Jr., attorney for this corporation, stated that, in light of the aforegoing factors bearing on the financial affairs of this corporation, in his opinion the adoption of a plan of partial liquidation of this corporation is advisable provided that pertinent provisions of the Internal Revenue Code of 1954, as amended, and regulations issued pursuant thereto, and of the Maryland Corporation Laws are fully complied with *125 in effecting said partial liquidation. Wherefore, upon motion duly made, seconded and unanimously carried the following Resolution was passed. RESOLVED: that the plan of partial liquidation by which Three Thousand Two Hundred Two and Five Hundred Twelve One Thousandths (3,202.512) shares of no par value of the amount of Four Thousand (4,000) shares of outstanding capital stock of this corporation be retired amounting to 80.0628% of said outstanding stock based on share value of July 1, 1965 be approved and the officers of the corporation are directed to effect said partial liquidation immediately and to file Articles of Reduction with the Maryland Department of Assessments and Taxation reflecting such retirement. At this meeting no formal resolution was adopted providing for the complete liquidation of the corporation. On July 15, 1965, the shareholders of the corporation had a meeting at which the resolution adopted by the directors on July 5, 1965, was approved. On July 16, 1965, the corporation filed with the Maryland State Department of Assessments and Taxation a document entitled Articles of Reduction stating that the capital of the corporation was reduced from $81,558.58 *126 to $16,260.50 as a result of action of the corporation in retiring 3,202.512 shares of its stock. On July 19, 1965, the corporation distributed $164,000 equally among the four petitioners. The corporation filed with the district director of internal revenue a form 966 (Return of Information to be Filed by Corporations within 30 days after Adoption of plan of dissolution or complete or partial liquidation). Therein was set forth the resolution of July 5, 1965, above quoted which referred to a partial liquidation. No mention was made of the adoption of a plan of complete liquidation. Thereafter the corporation continued to rent the building to the medical partnership on the same terms and the rent was continued at the same rate until sometime in 1969. The amount of earnings and profits of the corporation available for distribution during its fiscal year ended June 30, 1966, was $128,507.18. Petitioners Jones and Lenhard each reported the amounts they received in the July 19, 1965, distribution on their Federal income tax returns for the year 1965 as long-term capital gain as follows: Amount Received
$41,000.00
Less Basis 14,433.29
Capital Gain
$26,566.71
*127 Petitioners Fahey and Horton each reported the amounts they received in the July 19,1965, distribution on their Federal income tax returns for the year 1965 as long-term capital gain as follows: Amount Received
$41,000.00
Less Basis 26,348.00 l Capital Gain
$14,652.00
On September 13, 1966, the corporation filed a declaration commencing a law suit against the St. Paul at Chase Corporation, and the architect, the excavating contractor, and the building contractor for damages in the amount of $200,000 for negligently causing the building at 1117 St. Paul Street to 729 become severely damaged, untenantable, and unsalfe for occupancy. On October 2, 1967, Tighe presented to the Internal Revenue Service a protest signed by himself and three of the petitioners and their wives, protesting the finding of a revenue agent that the $164,000 distribution from the corporation to the petitioners constituted dividends to them. The protest did not mention any intention or plan concerning the complete liquidation of the corporation. The protest claimed that the July 19, 1965 payment constituted a partial liquidation under section 346(a) of the Internal Revenue Code *128 of 1954 based on an asserted contraction of the corporate business. Tighe had prepared the articles of incorporation of the corporation, its minutes, and its tax returns and represented it in audits before the Internal Revenue Service. On December 23, 1968, petitioners Horton, Jones, and Fahey entered into a contract to buy a building at 1217 St. Paul Street in Baltimore. This building was acquired by them as a joint venture. They settled on this building in February 1969. In the summer of 1969, the medical partnership began to move from 1117 St. Paul Street to 1217 St. Paul Street. This move was completed on August 1, 1969. The Board of Directors of the corporation met on August 1, 1969, and adopted a plan of complete liquidation as follows: The following Supplemental Plan of Dissolution, Complete Liquidation and Termination of Existence of the Corporation, hereinafter called the "Plan", shall be effective upon the adoption and approval of the Plan at a special meeting of stockholders by the affirmative vote of the holders of record of not less than two-thirds (2/3) of the outstanding shares of the Corporation. The date of such adoption and approval by the stockholders is hereinafter *129 called the "effective date". It was provided that after payment of all liabilities, the assets, including the property at 1117 St. Paul Street (subject to the indebtedness due Mercantile Safe Deposit and Trust Co.), and the claim against St. Paul at Chase Corporation and others, should be distributed to the stockholders. On the same date a meeting of the stockholders of the corporation approved the plan of liquidation. On April 9, 1970, articles of dissolution of the corporation were filed. The above plan was drafted and adopted after the issues involved in the present case were raised by the Internal Revenue Service. In the suit by the corporation against the St. Paul at Chase Corporation and others a verdict was returned in favor of the corporation for $76,000 and an order awarding judgment for the corporation in this amount was entered on December 18, 1969. The judgment was appealed by the defendants and the suit was settled in July 1970 for the amount of $61,500. The corporation did not claim a loss for the damage to its building in the original return filed for the year ended June 30, 1966 or in any other original return. However, in 1969, it filed an amended return *130 for the year ended June 30, 1966 claiming a casualty loss of $85,775.23 due to the damage to the building. Opinion The principal issue is whether the distribution on July 19, 1965 of $164,000 pro rata to the petitioners by Eleven-O-Seven St. Paul Street, Inc., a corporation in which they were equal shareholders, was a distribution in partial liquidation of the corporation and taxable to the petitioners as capital gain as contended by them, or was a dividend taxable to them at ordinary rates, to the extent paid from earnings and profits of the corporation, as contended by the respondent. There are set forth in the margin pertinent provisions of the Internal Revenue Code of 1954. [1] A secondary issue is whether, if it is held that the distribution 730 constituted a dividend, the corporation suffered a casualty loss during the fiscal year ended June 30, 1966, which diminished its earnings and profits available for the distribution of taxable dividends during that year. *131 The petitioners contend that the distribution of July 19, 1965 was the first of a series of distributions in redemption of all the stock of the corporation pursuant to a plan adopted on July 5, 1965, that the distribution effected a partial liquidation of the corporation within the meaning of section 346(a) (1) of the Code, and that, therefore, the gain to them upon the distribution is taxable as capital gain. At the outset it is to be noted that the resolution adopted by the board of directors and approved by the stockholders, while referring to a plan of partial liquidation, made no mention whatever of a complete liquidation of the corporation. The petitioners, however, take the position that the resolution adopted on July 5, 1965, did not reflect the complete action taken. They contend, and there was testimony to the effect, that because of the condition of the building it was their intention to liquidate the corporation as soon as it was possible for the medical partnership to obtain another location. The reason given for not including in the written resolution any reference to a complete liquidation was that such information would become public through the filing of such *132 a resolution with the Department of Taxation and Assessments of the State of Maryland, which might lead to disclosure of the condition of the building, which in turn might damage their practice and also subject them to criminal and civil action in the event of complete or partial collapse of the building with ensuing injuries to persons. We fail to see how the mere disclosure of a resolution of complete liquidation of the corporation would have the dire effects stated. Nor is there any showing of any reason why the damaged condition of the building should necessarily cause a dissolution of the corporation. Furthermore, although there is no question that the building had been damaged, it appears that there had been by July 5, 1965, no definite decision to move therefrom. Indeed, as late as February 1967, it appears that petitioners were attempting to obtain information as to the safety of the building before taking any radical steps which would involve moving the location of their practice. It is to be further noted that in the Form 966 which the petitioners filed with the Internal Revenue Service pursuant to section 6043 of the Internal Revenue Code of *133 1954, no mention was made of a plan of complete liquidation. Furthermore, in 731 the protest filed with the Internal Revenue Service in October 1967, it was not contended that the distribution in question was a distribution in pursuance of a plan of complete liquidation of the corporation. Rather, the protest stated that there was a partial liquidation based on an asserted contraction of the corporate business. Indeed, the resolution adopted on July 5, 1965, spoke in terms of a contraction in the business activity of the corporation due to the contemplated early retirement from practice of two of the petitioners, which would seem to indicate an intention not to completely liquidate the corporation. It was not until August 1969, which was after the issues involved in the present case were raised by the Internal Revenue Service, that the corporation adopted a plan of complete liquidation and dissolution of the corporation. It seems incredible to us that the foregoing circumstances would exist if indeed there had been on July 5, 1965 the adoption of a plan of complete liquidation of the corporation. See Blaschka v. United States, 393 F. 2d 983 (Ct. Cls. 1968), and *134 Joseph F. Porter, Jr., 9 T.C. 556. In view of the foregoing, we cannot accept the contention of the petitioners that the distribution in question on July 19, 1965, constituted one of a series of distributions in redemption of all the stock of the corporation pursuant to a plan. Consequently, the distribution in exchange for a portion of the stock of the petitioners did not constitute a partial liquidation under section 346(a)(1). It should be added that apparently the petitioners do not now contend that the transaction constituted a partial liquidation within the meaning of section 346(a)(2) of the Code. In any event we think that section is not applicable. Here, after the transaction in question there was no contraction of the rental business of the corporation and each of the petitioners owned the same relative interest in the corporation. It is our conclusion that the distribution was essentially equivalent to a dividend to the petitioners to the extent of the corporation's earnings and profits available for the payment of taxable dividends, and is taxable under section 301(c) of the Code. There remains for consideration the contention of the petitioners that the *135 corporation suffered a casualty loss during its taxable year ended June 30, 1966, as a result of the damage to its building, and that this loss served to reduce its earnings and profits available for the payment of taxable dividends in that year. It is the petitioners' contention on brief that the deductible loss in the taxable year is $50,000 computed by subtracting from the claimed loss of $85,000 an amount of $35,000 claimed to be the amount of loss with respect to which there was a reasonable prospect of recovery. Section 1.165-1(d)(2) of the Income Tax Regulations[2] provides that if in the year of a casualty there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery no portion of the loss is deductible until it can be ascertained with reasonable certainty whether or not such reimbursement will be received. Such regulation has been approved. Louis Gale, 41 T.C. 269. *136 In September 1964, the petitioner engaged the services of an attorney who handled its claim for damages to its building and in September 1966 a suit was filed claiming damages of $200,000. Such suit was ultimately settled in 1970 for $61,500. Under all the circumstances, it is our conclusion that in its taxable year ended June 30, 1966, the corporation had a valid claim with respect to which there was a reasonable prospect of recovery of some amount. In that year it could not be ascertained with reasonable certainty what amount would be received upon the claim. Under the circumstances, we hold that the corporation was not entitled to any deduction in its taxable year ended June 30, 1966 on account of the damage to its building. See Commissioner v. Harwick, (C.A. 5) 184 F. 2d 835, affirming a Memorandum Opinion of this Court. 732 Accordingly, its earnings and profits available for the payment of taxable dividends in its taxable year ended June 30, 1966, may not be reduced on account of the claimed casualty loss. It is unnecessary to consider other arguments advanced by the respondent upon this issue. Decisions will be entered under Rule 50. Footnotes
1. Cases of the following petitioners are consolidated herewith: Raymond E. Lenhard and Mary N. Lenhard, Docket No. 2350-69; William P. Horton and Eleanor B. Horton, Docket No. 2351-69; and John J. Fahey and Betty H. Fahey, Docket No. 2352-69.↩
*. A four dollar difference between this figure and the total cash contributed by Doctors Horton and Fahey was not explained in the record.↩
1. SEC. 301 DISTRIBUTIONS OF PROPERTY. (a) In General. - Except as otherwise provided in this chapter, a distribution of property (as defined in section 317(a)) made by a corporation to a shareholder with respect to its stock shall be treated in the manner provided in subsection (c). * * * (c) Amount Taxable. - In the case of a distribution to which subsection (a) applies - (1) Amount constituting dividend. - That portion of the distribution which is a dividend (as defined in section 316) shall be included in gross income. (2) Amount applied against basis. - That portion of the distribution which is not a dividend shall be applied against and reduce the adjusted basis of the stock. (3) Amount in excess of basis. - (A) In general. - Except as provided in subparagraph (B), that portion of the distribution which is not a dividend, to the extent that it exceeds the adjusted basis of the stock, shall be treated as gain from the sale or exchange of property. SEC. 302. DISTRIBUTIONS IN REDEMPTION OF STOCK. (a) General Rule. - If a corporation redeems its stock (within the meaning of section 317(b)), and if paragraph (1), (2), (3), or (4) of subsection (b) applies, such redemption shall be treated as a distribution in part or full payment in exchange for the stock. (b) Redemptions Treated as Exchanges. - (1) Redemptions not equivalent to dividends. - subsection (a) shall apply if the redemption is not essentially equivalent to a dividend. * * * (d) Redemptions Treated as Distributions of Property. - Except as otherwise provided in this subchapter, if a corporation redeems its stock (within the meaning of section 317(b)), and if subsection (a) of this section does not apply, such redemption shall be treated as a distribution of property to which section 301 applies. SEC. 316. DIVIDEND DEFINED. (a) General Rule. - For purposes of this subtitle, the term "dividend" means any distribution of property made by a corporation to its shareholders - (1) out of its earnings and profits accumulated after February 28, 1913, or (2) out of its earnings and profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made. Except as otherwise provided in this subtitle, every distribution is made out of earnings and profits to the extent thereof, and from the most recently accumulated earnings and profits. To the extent that any distribution is, under any provision of this subchapter, treated as a distribution of property to which section 301 applies, such distribution shall be treated as a distribution of property for purposes of this subsection. SEC. 331. GAIN OR LOSS TO SHAREHOLDERS IN CORPORATE LIQUIDATIONS. (a) General Rule. - (1) Complete liquidations. - Amount distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock. (2) Partial liquidations. - Amounts distributed in partial liquidation of a corporation (as defined in section 346) shall be treated as in part or full payment in exchange for the stock. SEC. 346. PARTIAL LIQUIDATION DEFINED. (a) In General. - For purposes of this subchapter, a distribution shall be treated as in partial liquidation of a corporation if - (1) the distribution is one of a series of distributions in redemption of all of the stock of the corporation pursuant to a plan; or (2) the distribution is not essentially equivalent to a dividend, is in redemption of a part of the stock of the corporation pursuant to a plan, and occurs within the taxable year in which the plan is adopted or within the succeeding taxable year, including (but not limited to) a distribution which meets the requirements of subsection (b).↩
2. Section 1.165-1(d)(2) of the Income Tax Regulations provides in part as follows: If a casualty or other event occurs which may result in a loss and, in the year of such casualty or event, there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery, no portion of the loss with respect to which reimbursement may be received is sustained, for purposes of section 165, until it can be ascertained with reasonable certainty whether or not such reimbursement will be received. Whether a reasonable prospect of recovery exists with respect to a claim for reimbursement of a loss is a question of fact to be determined upon an examination of all facts and circumstances. Whether or not such reimbursement will be received may be ascertained with reasonable certainty, for example, by a settlement of the claim, by an adjudication of the claim, or by an abandonment of the claim. * * *↩