**Clara D. BLASCHKA**

v.

**The UNITED STATES.**

**No. 121–64.**

United States Court of Claims.

May 10, 1968.

984

N. Barr Miller, Washington, D. C., attorney of record for plaintiff. J. Marvin Haynes, Joseph H. Sheppard, Walter D. Haynes, Jerome D. Meeker, Haynes & Miller, Washington, D. C., and Ralph F. Anthony, New York City, of counsel.

Michael I. Saltzman, Washington, D. C., with whom was Asst. Atty. Gen., Mitchell Rogovin, for defendant. Philip R. Miller, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

## OPINION

PER CURIAM:

This case was referred to Trial Commissioner Roald A. Hogenson with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 57 (a). The commissioner has done so in an opinion and report filed on April 19, 1967. The commissioner's findings of fact were accepted by the parties but plaintiff excepted to the commissioner's conclusions of law. The case has been submitted to the court on the briefs of the parties and oral argument of counsel.

With respect to § 346(a) (2), the court puts its decision not only on the basis stated by the trial commissioner, but also on the ground that the distribution here was "essentially equivalent to a dividend" in that there was no contraction of C & C's business. See Bittker and Eustice, Federal Income Taxation of Corporations and Shareholders (1966), Sec. 7.62, pp. 309–312.

Since the court agrees with the commissioner's opinion with deletions, his findings, and his recommended conclusion of law, as hereinafter set forth, it hereby adopts the same, as modified, and as supplemented by the preceding paragraph, as the basis for its judgment in this case. Therefore, plaintiff is not entitled to recover and the petition is dismissed.

Commissioner Hogenson's opinion, as modified by the court, is as follows:

Plaintiff has brought suit to recover income tax and deficiency interest for the year 1959 in the total amount of $74,-344.38 plus interest. The sole question is whether a distribution of $115,000 to plaintiff by C. & C. Blaschka, Inc., was a dividend taxable as ordinary income or was a distribution in partial liquidation with the gain realized taxable as long-term capital gain.

The basic facts are not in dispute. Plaintiff and her husband, Carl J. Blaschka, are and were the sole stockholders in C. & C. Blaschka, Inc. (hereinafter referred to as C & C), plaintiff owning approximately 92.3 percent of the stock and her husband 7.7 percent. The Blaschkas are the executive officers of C & C and, together with their accountant, comprise the board of directors. From 1955 until 1959, both plaintiff and her husband devoted full time to the business activities of C & C.

Until July 1, 1959, C & C was engaged in the wholesaling of popularly priced gloves throughout the United States. This business requires the ability to select popular glove styles, a talent demanding ingenuity and years of experience as well as a great deal of time and travel. Plaintiff and her brother-in-law did the selecting for C & C. In addition, C & C has a wholly owned Canadian subsidiary, Max Mayer & Co., Ltd. (hereinafter called Max Mayer, Ltd.), which is engaged in the wholesale glove business in Canada. C & C keeps tight control over this Canadian corporation and makes every decision of any importance for it. In return for these services, Max Mayer, Ltd. has paid C & C since 1935 an annual "administrative fee" of 3 percent of the net sales of Max Mayer, Ltd.

In 1958, after the loss of two key employees through illness and death, C & C

decided to dispose of its United States glove business. By a contract effective July 1, 1959, C & C sold this business to unrelated third parties for $646,442.31, payable in notes and preferred stock. The sale included the name Max Mayer which became the name of the new corporation to which C & C transferred all the assets.

As a result of the sale, C & C had more funds than it needed. After a number of conferences involving the Blaschkas, their accountant and their attorney, it was decided that C & C would enter the real estate rental field. To that end, C & C purchased all the outstanding stock of the Clairette Manufacturing Company, Inc. (hereinafter referred to as Clairette) from its sole stockholder, Mrs. Blaschka, plaintiff herein. Since 1955, Clairette's sole business had been the renting of a building it owned to C & C for warehouse purposes. After the sale, Clairette continued to rent the building to the purchasers of C & C's United States glove business. The transaction was consummated on September 28, 1959, with the transfer by plaintiff of the entire Clairette stock in return for $115,000. It is the tax treatment of this purchase by C & C that is in dispute.

Since plaintiff owned more than 50 percent of the outstanding stock of C & C and Clairette, this sale falls within § 304 [1] of the Internal Revenue Code of

---

1. § 304. Redemption through use of related corporations.

(a) Treatment of certain stock purchases.—

(1) Acquisition by related corporation (other than subsidiary).—

For purposes of sections 302 and 303, if—

(A) one or more persons are in control of each of two corporations, and

(B) in return for property, one of the corporations acquires stock in the other corporation from the person (or persons) so in control, then (unless paragraph (2) applies) such property shall be treated as a distribution in redemption of the stock of the corporation acquiring such stock. In any such case, the stock so acquired shall be treated as having been transferred by the person from whom acquired, and as having been received by

the corporation acquiring it, as a contribution to the capital of such corporation.

(2) Acquisition by subsidiary.

* * * * *

(b) Special rules for application of subsection (a).—

(1) Rule for determinations under section 302(b).—

In the case of any acquisition of stock to which subsection (a) of this section applies, determinations as to whether the acquisition is, by reason of section 302(b), to be treated as a distribution in part or full payment in exchange for the stock shall be made by reference to the stock of the issuing corporation. In applying section 318(a) (relating to constructive ownership of stock) with respect to section 302(b) for purposes of this paragraph, section 318(a) (2) (C) shall be

1954. (References to the Internal Revenue Code of 1954 will hereinafter be made by section number only.) In essence § 304(a) (1) provides that if a person is in control of each of two corporations, and, in return for property, one of the corporations acquires stock in the other corporation from that person, the property is treated as a distribution in redemption of the stock of the acquiring corporation. This provision was enacted in response to a series of unfavorable judicial decisions in which the Treasury attempted unsuccessfully to tax these transactions as distributions essentially equivalent to a dividend and therefore taxable as ordinary income under what is now §§ 301 and 302. Trustees Common Stock John Wanamaker, 11 T.C. 365 (1948), aff'd per curiam, 178 F.2d 10 (3d Cir. 1949); Commissioner of Internal Revenue v. Pope, 239 F.2d 881 (1st Cir. 1957); Mertens, Law of Federal Income Taxation, § 9.106 at 247–50 (Rev. 1962).

The function of § 304, then, is to complement § 302. To that end, § 304(b) (1) provides that such a sale is defined as a redemption of the stock of the acquiring corporation, and that for purposes of § 302(b), whether such stock acquisition is be treated as a distribution in exchange for the stock is determined by reference to the stock of the issuing corporation. See also Reg. 1.304–2(a); Ralph L. Humphrey, 39 T.C. 199, 205 (1962). The essential question is whether the distribution has affected the stockholder's proportionate interest and control in the issuing corporation, and for that reason the special rule of § 304(b) (1) points to the issuing corporation to apply § 304(a) to § 302. S.Rep. No. 1622, 83d Cong., 2d Sess. 240 (1954); H.R.Rep. No. 1337, 83d Cong., 2d Sess., A79 (1954); 3 U.S.C. Cong. & Admn. News, pp. 4217, 4877 (1954). The stockholder's sale of his stock in one corporation to a related corporation could substantially change his interest in the issuing corporation, or on the other hand, be a change of form only, with no effect on the stockholder's actual control. Lefevre, Purchases of Stock by Related Corporations—Acquisitions or Redemptions?, 14th Ann.Tul.Tax Inst. 441, 449 (1965). Although § 304 (b) (2) provides that the determination of the amount, paid in the stock redemption as defined in § 304(a) (1), which is a dividend shall be made solely with reference to the earnings and profits of the acquiring corporation, no mention is made of § 302(b) in that paragraph, nor is there any provision in § 304 [2] or else-

---

applied without regard to the 50 percent limitation contained therein.

(2) Amount constituting dividend.—

(A) Where subsection (a) (1) applies.—

In the case of any acquisition of stock to which paragraph (1) (and not paragraph (2)) of subsection (a) of this section applies, the determination of the amount which is a dividend shall be made solely by reference to the earnings and profits of the acquiring corporation.

\* \* \* \* \*

(c) Control.—

(1) In general.—

For purposes of this section, control means the ownership of stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote, or at least 50 percent of the total value of shares of all classes of stock. If a person (or persons) is in control (within the meaning of the preceding sentence) of a corporation which in turn owns at least 50 percent of the total combined voting power of all stock entitled to vote of another corporation, or owns at least 50 percent of the total value of the shares of all classes of stock of another corporation, then such person (or persons) shall be treated as in control of such other corporation.

(2) Constructive ownership.—

Section 318(a) (relating to the constructive ownership of stock) shall apply for purposes of determining control under paragraph (1). For purposes of the preceding sentence, section 318(a) (2) (C) and 318(a) (3) (C) shall be applied without regard to the 50 percent limitation contained therein.

2. For an excellent analysis of the complexities and uncertainties of § 304, with special attention to recent cases, and with recommendations for legislative and administrative clarifications, see Marans, Section 304: The Shadowy World of Re-

where in the 1954 Code, as to which corporation is to be tested to determine whether there has been a partial liquidation in a stock redemption through use of related corporations. It is significant, however, that subsection (e) of § 302, by statutory cross reference, points to § 331, and this together with the considerations underlying the tax treatment of partial liquidations require that a § 304 stock redemption, involving the question of a partial liquidation under §§ 331(a) (2) and 346, be tested on the level of the acquiring corporation. S.Rep. No. 1622, supra, at 49; U.S.Cong. & Admn.News, supra, at p. 4680. The very nature of a partial liquidation, at least as purportedly involved in this case, is a curtailment or contraction of the activities of the acquiring corporation, and the distribution to a stockholder of unneeded funds in exchange for stock in a related corporation. It is concluded that the purported partial liquidation is not to be measured by § 302, but that the general rule of § 304 (a)—that the stock sale is to be treated as a redemption by the acquiring corporation—applies, subject, however, to the statutory definition as to what constitutes a partial liquidation under §§ 331 and 346 of the 1954 Code, applied to the acquiring corporation.

Thus, whether the payment of $115,000 by C & C for the stock of Clairette is a partial liquidation under §§ 331(a) (2) and 346 must be determined with respect to the activities of C & C.[3] Section 346 provides three tests to determine whether

demptions through Related Corporations, 22 N.Y.U.Tax Law Rev. 161 (1967).

3. § 331. Gain or loss to shareholders in corporate liquidations.
(a) General rule.—
* * * * *
(2) Partial liquidations.—
Amounts distributed in partial liquidation of a corporation (as defined in section 346) shall be treated as in part or full payment in exchange for the stock.
(b) Nonapplication of section 301.—
Section 301 (relating to effects on shareholder of distributions of property) shall not apply to any distribution of property in partial or complete liquidation.
* * * * *
§ 346. Partial liquidation defined.
(a) In general.—
For purposes of this subchapter, a distribution shall be treated as in partial liquidation of a corporation if—
(1) the distribution is one of a series of distributions in redemption of all of the stock of the corporation pursuant to a plan; or
(2) the distribution is not essentially equivalent to a dividend, is in redemption of a part of the stock of the corporation pursuant to a plan, and occurs within the taxable year in which the plan is adopted or within the succeeding taxable year, including (but not limited to) a distribution which meets the requirements of subsection (b). * * *
* * * * *
(b) Termination of a business.—
A distribution shall be treated as a distribution described in subsection (a) (2) if the requirements of paragraphs (1) and (2) of this subsection are met.
(1) The distribution is attributable to the corporation's ceasing to conduct, or consists of the assets of, a trade or business which has been actively conducted throughout the 5-year period immediately before the distribution, which trade or business was not acquired by the corporation within such period in a transaction in which gain or loss was recognized in whole or in part.
(2) Immediately after the distribution the liquidating corporation is actively engaged in the conduct of a trade or business, which trade or business was actively conducted throughout the 5-year period ending on the date of the distribution and was not acquired by the corporation within such period in a transaction in which gain or loss was recognized in whole or in part.
Whether or not a distribution meets the requirements of paragraphs (1) and (2) of this subsection shall be determined without regard to whether or not the distribution is pro rata with respect to all of the shareholders of the corporation.
(c) Treatment of certain redemptions.—
The fact that, with respect to a shareholder, a distribution qualifies under section 302(a) (relating to redemptions treated as distributions in part or full payment in exchange for stock) by reason of section 302(b) shall not be taken into account in determining whether the distribution, with respect to such shareholder, is also a distribution in partial liquidation of the corporation.

a distribution is to be treated as a payment in partial liquidation. The first, dealing with a series of distributions culminating in the complete liquidation of the corporation, is not applicable here since C & C has not and has no intention of completely liquidating. The second, § 346(a) (2), provides that a distribution will be considered as a payment in partial liquidation if it is not essentially equivalent to a dividend and is made pursuant to a plan, the payments being made within 2 years of the adoption of the plan. The requirement that the payment be made pursuant to a plan is crucial here, since it is apparent that C & C never adopted a formal plan of partial liquidation. The third test concerns the provisions of § 346(b), hereinafter discussed.

 That a formal plan of liquidation is not required to qualify under § 346 is clear. Fowler Hosiery Co. v. Commissioner, 36 T.C. 201, 218 (1961), aff'd, 301 F.2d 394, 397 (7th Cir. 1962). However, there must be clear evidence of an intention to liquidate if an informal plan is to be established. Oberndorfer, Partial Liquidations, N.Y.U. 13th Ann. Inst. on Fed. Tax. 637, 643 (1955). For instance, in the *Fowler* case, supra, taxpayer corporation had six wholly owned United States subsidiaries and one wholly owned Canadian one. Taxpayer entered into a contract which in effect sold its business and that of its United States subsidiaries to a third party. The Canadian subsidiary also entered into a like contract with the same party. At a special stockholders meeting, taxpayer's stockholders ratified this first contract and adopted a resolution to dissolve. A similar meeting was held for the Canadian corporation. However, only the contract was ratified at this meeting. Because the Canadian corporation paid the money it received from the sale to taxpayer, the latter argued that it had received a dividend subject to the foreign tax credit. The court held that the payments were made in partial liquidation pursuant to an informal plan of liquidation. In addition to the above facts and the clear tax avoidance scheme, the court

noted that the Canadian corporation had filed documents with the Canadian authories, stating that it was in the process of liquidation.

Another instance where an informal plan of liquidation was found is Holmby Corporation v. Commissioner, 28 B.T.A. 1092 (1933), aff'd 83 F.2d 548 (9th Cir. 1936). In that case taxpayer corporation was a holding company whose sole stockholder had died. The corporation's directors then sold all its assets. At a special directors meeting on November 10th, a dividend of $50 a share was declared. On November 17, another special meeting was held, and another dividend was declared. On November 22, the corporation was liquidated and the remainder of the funds paid out. Taxpayer claimed that the first two distributions were dividends because a formal plan of liquidation had not been adopted until November 22. The court found otherwise on the grounds that the distributions of November 10 and November 17 were made pursuant to an informal plan of liquidation.

In the instant case, C & C had adopted no plan of partial liquidation, either formal or informal, when it paid $115,000 for the Clairette stock. The official minutes of C & C show that there were two special meetings of the stockholders and four special meetings of the board of directors in 1959, and no meetings of either the stockholders or the directors in 1960. Nowhere in these minutes is there any discussion or mention of a plan of partial liquidation of C & C. The corporate resolution dated September 10, 1959, which accepted Mrs. Blaschka's offer of the Clairette stock, likewise makes no mention of any partial liquidation.

Plaintiff contends, however, that the purchase of the Clairette stock was part of a plan of partial liquidation discussed and informally adopted by the directors of C & C, and that the plan was not recorded in the corporate minutes because C & C's accountant and attorney did not think it necessary. But the facts indicate otherwise. Mr. Blaschka ad-

mitted that the purchase of Clairette's stock was made only after considering the tax aspects of the transaction. To assert that legal counsel advised a partial liquidation but did not make any written record of the plan is incredulous.

This is all the more so when one considers plaintiff's Notice of Protest of the tax deficiency in controversy in this suit, a nine-page memorandum filed under oath with the Internal Revenue Service. No mention is made in that document of any partial liquidation being carried out by C & C. Furthermore, C & C stated in a memorandum sent to the Internal Revenue Service in 1961 concerning accumulated earnings tax that after its sale of the United States glove business, C & C decided to enter the industrial real estate business rather than liquidate. This is substantiated by Mr. Blaschka's testimony that the purchase of Clairette, whose sole business was the renting of a warehouse, was chosen as C & C's initial entry into this new field because the warehouse was known to be a good rentable building. In view of all this evidence, it is clear that the purchase of the Clairette stock was not pursuant to a plan of partial liquidation and the transaction cannot qualify under § 346(a) (2).

Nor does it come under the so-called "safe harbor" of § 346(b). Under that subsection, if a corporation has been conducting two or more separate and active businesses for at least 5 years and then ceases one of the businesses, the distribution of the assets of this ceased business or the proceeds from their sale shall be treated as a payment in partial liquidation so long as after the distribution the corporation continues to conduct actively at least one of the preexisting businesses. Just what constitutes "actively engaged in the conduct of a trade or business" for purposes of § 346 is defined in § 1.346–1(c) of the Regulations, by incorporation of § 1.355–1 (c):

> * * * a trade or business consists of a specific existing group of activities being carried on for the purpose of earning income or profit from only such group of activities, and the activities included in such group must include every operation which forms a part of, or a step in, the process of earning income or profit from such group. Such group of activities ordinarily must include the collection of income and the payment of expenses. [Treas. Reg. § 1.355–1(c)]

Plaintiff contends that C & C's management of its wholly owned subsidiary, Max Mayer, Ltd., is a separate trade or business apart from its United States glove business, thereby qualifying the distribution of the proceeds from the sale of the United States business through the purchase of the Clairette stock as a partial liquidation.

Aside from the general definition found in the Regulation, only a few cases have considered the question of what constitutes two separate trades or businesses. What few guidelines exist are found mainly in the 16 examples contained in Reg. 1.355–1(d) and in the more than 25 rulings published by the Treasury. See McDonald, Tax Considerations in Corporate Divisions: Contraction and Liquidation, 39 Taxes (The Tax Magazine of C.C.H.) 994, 1000–1001, nn. 60–63 for a complete listing of these rulings through 1961. As a result, the law has developed slowly on an *ad hoc* basis, with general principles not readily discernible from these factual patterns. However, common threads that run through many of these cases indicate that C & C was not engaged in the active conduct of two separate businesses in 1959.

One factor that reappears in several of the rulings is whether each business produces a substantial part of the combined income. In Rev.Rul. 57–333, 1957–2 Cum.Bull. 239, a corporation engaged in the food brokerage business also owned an adjacent vacant lot which it leased to a used car dealer. The rental received for the land for each of the last 5 years was less than 2 percent of the total gross income of the entire business. It was ruled that the rental of the lot did not

constitute a separate business for purposes of § 346(b), with specific mention being made that the rental income received was only a nominal portion of the total gross income. In Rev.Rul. 56–266, 1956–1 Cum.Bull. 184, a corporation operated a retail grocery chain, manufactured and distributed bakery products, and produced and distributed creamery products, as well as owned real estate which it leased to its grocery stores for a rental based on a percentage of gross sales. The real estate activities were ruled not to be a business separate and apart from the grocery business.

Again, in Rev.Rul. 57–464, 1957–2 Cum.Bull. 244, a corporation manufactured heating equipment and owned a modern factory building, an old factory building which it used for storage purposes, and three rental properties. The real estate activities did not constitute a separate business, ruled the Treasury. Once more it was pointed out that the net income received from these properties was "negligible."

Also, in three judicial decisions all holding that two separate businesses did not exist, in which the question was whether the businesses were being *actively* conducted or not, the courts in each instance made reference to the small amount of income produced and lack of adequate record-keeping usually performed in a business. Isabel A. Elliott, 32 T.C. 283, 290–291 (1959); Theodore F. Appleby, 35 T.C. 755, 761 (1961), aff'd per curiam 296 F.2d 925 (3d Cir. 1962), cert. denied, 370 U.S. 910, 82 S.Ct. 1256, 8 L.Ed.2d 404 (1962); Bonsall v. Commissioner of Internal Revenue, 317 F.2d 61, 64 (2d Cir. 1963). Cf. Example (16) in Reg. 1.355–1(d) involving a corporation that manufactured and sold automobiles and maintained an executive dining room for profit.[4]

That the underlying consideration running throughout these rulings was the sufficiency or insufficiency of income produced rather than some other factor can be seen in those rulings in which

two separate businesses were found. Most striking is Rev.Rul. 58–164, 1958–1 Cum.Bull. 184. There, a corporation sold textile products as a commission merchant and owned a valuable building which it leased to outsiders for a substantial net rental. It was ruled that two separate businesses existed. Also, in Rev.Rul. 57–334, 1957–2 Cum.Bull. 240, a corporation rented to others three separate parcels of real estate. It was ruled that rental of one of the three buildings involved constituted a separate business since the remaining real estate accounted for only half the corporation's income. And in Rev.Rul. 56–557, 1956–2 Cum.Bull. 199, the ruling again points to the importance of the fact that the income from the challenged business was substantial, in a determination that there were two separate businesses.

Turning to the income figures in the instant case, they reflect clearly that the services performed for Max Mayer, Ltd., by C & C produced so little income as not to be a business separate and distinct from the United States glove business. In return for these services, Max Mayer, Ltd., paid C & C an "administrative fee" of 3 percent of Max Mayer, Ltd.'s net sales, a figure set in 1935 by plaintiff's uncle. From 1952 through 1958, this *gross* administrative fee was only 1 percent of C & C's *net* sales of $13,893,677.-95 for that period. Furthermore, from 1935 to 1962, C & C did not even allocate on its books the expenses attributable to the work performed for Max Mayer, Ltd.—hardly the practice of a corporation in the business of managerial and financial services. Cf. Isabel A. Elliott, supra; Theodore F. Appleby, supra, Bonsall v. Commissioner of Internal Revenue, supra. Since 1962, the Canadian authorities have required C & C to submit a detailed statement of the specific charges for its services to Max Mayer, Ltd. In 1962, out of a total administrative fee of $24.-784.05, C & C earned a profit of only $751.96, or a return of approximately 3 percent. Projecting this profit margin

4. Each "Example" cited will be from Reg. 1.355–1(d).

back over the period from 1952 through 1958, C & C's total profits from administrative fees were approximately $4,261, or 1.5 percent of C & C's total net profits before taxes of $283,622 for that period. Such negligible amounts hardly meet the requirement included in Regulation § 1.346–1(c) that the activities be carried on "for the purpose of earning income or profit." Treas. Reg. § 1.355–1(c), supra.

The Regulations and Treasury Rulings, also, seem to require some form of separation of control and supervision to find separate businesses. In Rev.Rul. 58–54, 1958–1 Cum.Bull. 181, a corporation operated a soft drink bottling and distributing business. All the bottling was done at the main plant although it was distributed through facilities located in four different localities. The Treasury ruled that the distributing facilities did not constitute a separate business or businesses "despite some geographical differences in warehouse locations. They all formed part of one integrated business wherein the product was manufactured in one place, although distributed through several warehouse points." 1958–1 Cum.Bull. 181 at 182.

Rev.Rul. 56–451, 1956–2 Cum.Bull. 208 involved a corporation which published four trade magazines. The metal working magazine had its own editorial staff and advertising space salesmen, who devoted their entire time to this magazine. This publication had separate offices in the same building as the others and kept separate books. The only employees it shared with the others were the general officers of the corporation and certain clerical and production employees. The three other magazines served the electrical industry. The Treasury ruled that the metal working magazine was a separate business.

The Regulations provide still another example. Taxpayer corporation owns and operates two men's retail clothing stores, one in the city and one in the suburbs. The manager of each store directs its operations and makes the necessary purchases. No common warehouse is maintained. Under these circumstances the Regulations state that the activities of each store constitute a trade or business, evidently on the grounds of separate control and operation. (Example (10).)

In short, Max Mayer, Ltd., is a separate and distinct business from C & C in corporate form, but otherwise only in a geographical sense. There is some indication in the Regulations that geographical separation is enough. In Example (8), a corporation which manufactures ice cream at plants in two states is said to operate a trade or business in each state. To the same effect are Examples (13), (14), and (15). Just how these Examples relate to Example (10) supra, where geographical separation existed but where other factors were specifically mentioned, is not clear. Moreover, there is Rev.Rul. 57–190, 1957–1 Cum.Bull. 121. The facts there involved a corporation which sold and serviced cars, carrying on its operations in two buildings located some distance apart in the same city. The Treasury ruled that the separate locations were not sufficient to create separate businesses.

Thus, geographical separation by itself is of questionable significance. Also, all of the above-mentioned Examples (where apparently geographical separation was sufficient) are distinguishable from the instant case. Each Example involved a manufacturing business, manufacturing its products at several locations. Each plant was a viable entity, capable of producing the product from beginning to end. In spite of its separate corporate entity, Max Mayer, Ltd., was in no way viable by itself. Rather did it depend upon the decisions of C & C for what it sold and how it sold. Before the Clairette stock sale, plaintiff owned 100 percent of the Clairette stock and 92.3 percent of the C & C stock, and C & C owned 100 percent of Max Mayer, Ltd. This control of all three corporations becomes absolute when the husband's 7.7 percent share of C & C is added. The circumstances strongly infer that in reality the "stock redemption" was equivalent to the declaration of a

**992**

dividend, especially in view of the large accumulation of earned surplus by the redeeming corporation. When this factor is considered with the negligible amount of income and profits realized, the conclusion is that the management services provided by C & C to Max Mayer, Ltd., were not an "active trade or business" separate and apart from its own operations.

Therefore, the purchase of the Clairette stock by C & C was not a distribution in partial liquidation. The sum of $115,000 is deemed to be paid out of C & C's earnings and profits and taxable at ordinary income rates as a dividend pursuant to §§ 302 and 301(c) (1). Plaintiff's petition for a refund should be dismissed.