NORD W. KRAUSKOPF AND THEODORA L. KRAUSKOPF, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Krauskopf v. Commissioner
Docket No. 11662-81.
United States Tax Court
T.C. Memo 1984-386; 1984 Tax Ct. Memo LEXIS 287; 48 T.C.M. (CCH) 620; T.C.M. (RIA) 84386; July 26, 1984. John H. Cooper and Kaye K. Houser, for the petitioners. Linda J. Wise, for the respondent. SHIELDS
MEMORANDUM FINDINGS OF FACT AND OPINION SHIELDS, Judge: Respondent determined deficiencies in the income tax due from petitioners as follows: Taxable Year
Deficiency
1976
[1] $3,046.00
1977
85,501.00
1978
7,187.07
After concessions, the issues remaining for decision are: (1) whether the distribution by K & K Insurance Administrators, Inc. to petitioner, Nord W. Krauskopf, of a 1969 Dodge Charger Daytona, known as stock car Number 71, qualified as part of a partial liquidation under section 346; [2] and (2) whether the fair market value of stock car Number 71 at the time it was thereafter contributed by Krauskopf *290 to the National Motorsports Hall of Fame was in excess of $25,000, and if so, the value of such car at that time. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and exhibits attached thereto are incorporated herein by reference. Petitioners, Nord W. and Theodora L. Krauskopf, husband and wife, resided in Indiana at the time their petition was filed in this case. Theodora L. Krauskopf is a party to this proceeding solely because she filed a joint return with her husband. Consequently, the word "petitioner" in the singular, as used hereinafter, will refer to Nord W. Krauskopf only. Prior to 1957 petitioner was employed as an insurance agent and racing driver. In 1957 he organized an Indiana corporation known as K & K Insurance Agency, Inc., to sell insurance, primarily automobile racing insurance, using its own policies which were based upon risk evaluations formulated by the petitioner. Unlike most agencies, K *291 & K set its own rates, collected its premiums, and investigated and settled its claims. The company's insurance business was very successful because at that time there were only two other firms engaged in this specialized line of insurance in the United States and from about 1970 to 1975, K & K insured approximately 750 race tracks throughout the United States, one of its major accounts being the International Hot Rod Association. In 1966 K & K acquired some stock cars and began to compete on the Grand National Circuit of the National Associaton of Stock Car Auto Racing (NASCAR) at such tracks as Daytona, Talladega, Darlington, Charlotte, Dover Downs, Riverside, and Michigan International. The racing competition by K & K and its successor continued until 1976. The competition was among medium-sized American cars such as Dodge Chargers, Ford Fairlanes, and Matadors from American Motors. At first K & K entered only about 11 races per year but by 1970 the number had increased to 30 to 40 per year. In order to handle the cars and races, K & K engaged a crew chief and a racing crew which included several mechanics and pit men. It also purchased a truck and a trailer to transport *292 the cars. Between races, the cars were stored in a garage leased by K & K. Petitioner who was the sole stockholder and principal officer and director of K & K hired the crew chief and its members. He was also responsible for the lease on the garage and the acquisition of the race cars, the truck and the trailer. He regularly attended races and helped make strategic decisions during races and pit stops. Chrysler Corporation contributed the parts to build the Dodge Chargers owned by K & K. Normally, K & K entered just one car in a race, but on at least two occasions it entered more than one car because promoters would often pay an owner a premium of $4,000 to $5,000 to put in an additional car if the race was short on participants. During its racing activity the racing income and expenses of K & K were reported on its returns as general income and general expenses except for 1973 when the racing income was reported separately. On K & K's depreciation schedules for 1969 and 1970 the race cars were shown as being held for advertising. At trial petitioner did not produce any separate books or records of K & K's racing income or expenses. He was also unable to recall or demonstrate *293 the average annual income that was generated by its racing activities, the average annual cost of operating its racing team, or the cost of maintaining its stock cars. K & K obviously had substantial gross income from its racing activities, one important source being automotive suppliers such as Goodyear Tire Company, which paid top competitors such as K & K for permitting Goodyear to display its decal on K & K's cars and to advertise that K & K used Goodyear tires. Goodyear paid K & K from $40,000 to as much as $120,000 per year for such permission. Other such sponsors included S.T.P., Monroe Shocks, Union 76 Gasoline, and Perfect Circle Piston Rings. Still another source of gross income was the NASCAR Winston Cup Point Fund. This was an annual fund which was built up with amounts withheld from every purse plus a substantial contribution by Winston. During the racing year points in each race were assigned to participants in accordance with where their cars placed in the race. At the end of the year, the money was distributed to the top ten point-holders. K & K was in the top ten in seven out of the eleven years it competed and, in 1970, it placed number one in the Winston *294 Cup Point Fund, using the 1969 Dodge Charger Daytona which became known as Number 71. K & K also received gross income in the form of royalties from toy companies which manufactured and sold kits for making a model of Number 71. Substantial gross income was also received from the racing itself. The average total purse was $200,000 to $250,000, the largest being at Daytona. A first place finish averaged about $25,000 at an average cost of about $5,000 including the percentage payable to the winning driver. A top performing car and driver could also produce about $500 per day at various functions arranged by the race promoters by appearing at and advertising local events such as radio and television programs or the opening of a new business or shopping center. When K & K entered the racing business in 1966, the petitioner, as its sole stockholder and principal officer and director, expected to derive considerable benefit from advertising K & K nationally, through racing publications, and especially through television since the K & K decal was prominently displayed on the side of its cars. He also expected to make a separate profit from its racing activities, and actually did *295 so in 1970 and 1971 while racing Number 71. This car, the 1969 Dodge Charger Daytona, and a hemi engine with a 426 cubic inch displacement. It was driven to several world records in 1969, 1970 and 1971 by the late Bobby Isaac. In 1969, with Isaac driving and Harry Hyde as crew chief, it won 17 out of 40 races entered in the Grand National Circuit. Only one stock car racer, the famous Richard Petty, has ever won more races in a single season. In 1970, the car won 11 out of 40 races entered, including the Grand National Championship. That year it also set a world record of 199.653 miles per hour for a stock car qualifying lap. This record was not broken until 1982. The car also had the world record at that time for the fastest lap around a closed course of 201.104 miles per hour. Furthermore, after the 1971 season the car set several land speed records at the Bonneville salt flats in Utah. It was often referred to as the fastest stock car in the world. Typically the life of a stock car on the Grand National Circuit is only about three years because the race promoters and the governing bodies prefer to have only the latest models on the track. In the usual case after three *296 years, any car owned by one of the top six to twelve racing teams is sold "down the line" to one of the less successful teams who after refurbishing and updating will continue to race it for a few more years on other circuits until finally it is used for parts or abandoned. Consequently in a typical case K & K would have sold Number 71 "down the line" at the end of 1971 and the car would have lost its identity, but because of its speed records and for sentimental reasons the petitioner decided to keep it. In 1972 it was not raced but was exhibited around the circuit on a national farewell tour from which K & K netted about $43,500. After the tour the car was partially dismantled and stored first in a garage and subsequently in an open but fenced lot behind the garage. In 1973, K & K Insurance Agency, Inc. merged with Insurance Administrators, Inc., a corporation wholly owned by one Grey C. Mosher. The new corporation was called K & K Insurance Administrators, Inc., but for convenience we will continue to refer to the successor as K & K. In the merger petitioner and Mr. Mosher each received 50 percent of the outstanding stock in the new corporation. Petitioner was the chairman *297 of its board of directors and its secretary. Mr. Mosher was president and the two of them constituted its board of directors. Mr. Mosher was unaware of K & K's racing activities until after the merger, but the new corporation continued such activities. It also continued to insure racing events. Its typical coverage was on a per day or per event basis and the insurance included the race track, drivers, pit crews, and spectators. Effective in 1971, NASCAR adopted new rules which limited to 305 cubic inches the engines which could thereafter be used in Dodge Charger Daytonas and required that carburetor restrictor plates be inserted in engines as large as the one in Number 71 during the interim. These rules reduced the advantage which the larger engines such as the one in Number 71 had and made the races more competitive. The restrictive rules, plus declining advertising value, led K & K to begin in about 1973 to wind down its racing activities. On June 15, 1976, K & K entered into an agreement with its stockholders. Under the agreement [3] all of the racing assets of the corporation were transferred to Auto Racetracks, Inc. (ARI), a new corporation wholly owned by petitioner, *298 except Number 71 which was transferred to petitioner; and a Dodge Charger in condition for Grand National stock car racing which was distributed to Greg Mosher under the distribution agreement. ARI also assumed certain obligations which K & K had under contracts with NASCAR, including an agreement by K & K to enter a car in each race of the Winston Cup competition for 1976 in return for the guaranteed sum of $80,000. ARI also agreed to cause any car entered in such competition to carry the K & K decal and to do such other things as may be necessary to "preserve the K & K national image." The agreement further provided that K & K and ARI would divide NASCAR point funds for 1976 on a pro rata basis. *299 Since ARI did not have sufficient capital to meet the financial obligations assumed under the distribution agreement, petitioner agreed to guarantee, and in fact subsequently advanced to ARI, sufficient funds to fulfill the terms of the agreement in 1976, 1977, and 1978. When the racing assets were distributed to its stockholders, K & K had a total net worth of $1,000,000 to $1,500,000. At the time of the distribution Krauskopf and Mosher were in agreement that the car distributed to Mosher was equal in value to Number 71 which was distributed to Krauskopf plus the net value of the assets distributed to his corporation, ARI. At the trial petitioner and respondent stipulated that Number 71 had a value of $25,000 and that the net value of the assets distributed to ARI was $5,000 (value of assets minus liabilities assumed). Pursuant to the distribution agreement, K & K received $4,402 in 1977 which it earned in 1976 as its pro rata share of the NASCAR point fund. On July 1, 1977, ARI sold its racing team and cars and thereafter was not involved in stock car racing. In 1976, when Number 71 was distributed to petitioner it was badly rusted and partially disassembled. The rust *300 was due in part to the salt which had been imbedded in the car while setting the world records on the salt flats at Bonneville and in part to the fact that the car had been exposed to the weather for about two years. Its front fenders and hood had been removed as well as its trunk lid and deck. One of the front wheels had also been removed and the entire front suspension had been open to the weather. Because of its condition the petitioner concluded at that time that it was worthless but, as stated before, at the trial he conceded that it had a value of $25,000 when distributed to him. In the fall of 1977 the petitioner was contacted by the chairman of the National Motorsports Hall of Fame about the possibility of the petitioner contributing Number 71 to the museum as its first race car. The Hall of Fame was planned for construction in 1978 near the Alabama International Motor Speedway at Talladega. After initial arrangements were made for the donation, petitioner had the car restored to its original racing condition. The cost of the restoration was $10,000, but Robert Gee, the man who did the restoration, had worked on Number 71 while employed by K & K as a pit mechanic during *301 its record-setting days from 1969 through 1971, and consequently, he charged petitioner a very reasonable price for the restoration. On December 10, 1977, petitioner donated Number 71 to the Motor-sports Hall of Fame which qualifies under section 170 to receive tax deductible contributions. On his joint return for 1977 petitioner claimed a deduction of $82,500 for the donation but on his joint return for 1976 he did not report any income upon receipt of the car. In support of the deduction the petitioner attached to his 1977 income tax return an appraisal by William R. Tuthill, the curator of the Museum of Speed in Daytona Beach, Florida. Mr. Tuthill appraised the car at $165,000. [4] Mr. Tuthill, however, did not testify at the trial and, therefore, we have not considered his appraisal in our deliberations. *302 At trial petitioner relied upon the testimony and a written appraisal of car Number 71 by M. H. "Tiny" Gould. In Mr. Gould's opinion, Number 71 had a value of $25,000 when distributed to the petitioner on June 15, 1976 and a value of $150,000 when he contributed it to the Hall of Fame on December 10, 1977. In his notice of deficiency, respondent determined that the distribution to petitioner on June 15, 1976 consisted of the stock car with a value of $7,500, and the net assets of $5,000 distributed to ARI for a total of $12,500 which constituted a dividend to petitioner under section 331. He also determined that the contribution to the Hall of Fame was only $17,500 (the $7,500 for the car at distribution plus the $10,000 in restoration) and disallowed the balance ($65,000) of the $82,500 deduction claimed on the return. At trial and on brief respondent contended that Number 71 had the same value on December 10, 1977 when it was given to the Hall of Fame as its stipulated value of $25,000 on June 15, 1976, with the possible exception of the $10,000 paid by the petitioner for its restoration. OPINION Partial Liquidation Under Section 346
The first issue for decision *303 is whether the distribution made by K & K on June 15, 1976, constituted a partial liquidation of the corporation within the meaning of section 346, [5] or is a distribution taxable as a dividend under section 301. If it was a partial liquidation, any gain realized by the petitioner from the distribution is taxable as a capital gain. If section 301 applies, any such gain is taxable as ordinary income. Petitioner contends that the racing activities of K & K were a separate business from its insurance operation, and that the advertising value of the stock cars only incidentally benefitted the insurance business. He also contends that the stock car competitions were undertaken with the objective of making a profit, and points to the fact that in two of its eleven years of racing K & K actually realized a profit. This in itself, petitioner *304 argues, is sufficient to prove that those activities constituted a separate business. Petitioner maintains that as an officer of K & K he performed active and substantial management and operational functions in connection with the racing activities, spending approximately one-quarter of his time on such activities. He concludes that under section 346 the distribution qualifies as a partial liquidation because both the racing activities and the insurance business constitute separate businesses which were carried on for more than five years prior to the distribution, the memorandum of agreement constituted a plan of distribution, and the absence of a redemption of part of the stock is of no consequence since he and Greg Mosher were equal stockholders and each received directly or indirectly half of the distributed assets. Respondent argues that petitioner has not established that there was a partial liquidation. He contends that there was only the insurance business, the racing activities being a part of its advertising, and that there was no significant contraction of the corporation's business after the distribution. During the years in issue section 346(a)(2) provided that a *305 distribution by a corporation is to be treated as a partial liquidation if (1) it is not essentially equivalent to a dividend, (2) it is in redemption of part of the stock of a corporation pursuant to a plan, and (3) it occurred within the taxable year in which the plan was adopted or the succeeding taxable year. [6] Under section 346(b), a distribution is treated as not essentially equivalent to a dividend if (1) it is attributable to the corporation's ceasing to conduct a business which has been actively conducted for the five years immediately preceding the distribution; and (2) immediately after the distribution, the liquidating corporation is actively engaged in a business which also was actively conducted throughout the five-year period ending on the date of the distribution. [7] If the requirements of section 346(b) are satisfied, the distribution is deemed not essentially equivalent to a dividend and the inquiry is thereafter limited to whether the other provisions of section 346(a)(2) have been met. Baan v. Commissioner,51 T.C. 1032, 1045 (1969), affd. sub nom. Gordon v. Commissioner,424 F.2d 378 (2d Cir. 1970), affd. per curiam 450 F.2d 198 (9th Cir. 1971). *306 *307 The parties agree that both the insurance business and the racing activities were actively conducted for the five years preceding the date of the distribution in June 1976. However, they disagree sharply as to whether the racing activities constituted a separate business within the meaning of section 346(b). For purposes of that subsection, a business "consists of a specific existing group of activities being carried on for the purpose of earning income or profit from only such group of activities, * * *. Such group of activities ordinarily must include the collection of income and the payment of expenses." Sec. 1.355-1(c), Income Tax Regs.; see also sec. 1.346-1(c), Income Tax Regs.[8]
Whether or not K & K's racing activities constituted a separate business is a question of fact on which the petitioner has the burden of proof. Welch v. Helvering,290 U.S. 111 (1933); Rule 142. After carefully reviewing the entire record, we have concluded that those activities *308 were not conducted as a separate business, but served instead as a vehicle for advertising the K & K insurance business to the racing public. Our conclusion is supported by the following: (1) In the early years of the racing activity, the stock cars were carried on K & K's depreciation schedules as advertising assets; (2) Mr. Mosher testified that he concluded that the racing activity was not worth continuing because the advertising value of the racing activity to K & K plus the receipts of K & K from other companies whose decals were displayed on the cars did not offset the racing expenses; (3) Petitioner's testimony that he spent one-quarter of his time on racing activities was contradicted by Mr. Mosher who stated that during the racing season both he and petitioner devoted 70 to 80 hours a week on insurance activities; (4) Although petitioner allegedly kept a "very tight reign" on the administration and finances of the corporation he was unable to submit any separate income and expense records for the racing activities for any of the years in which the activities were conducted; [9] and (5) In spite of the alleged extent and importance of K & K's racing activity Mr. Mosher was *309 not aware of such activity until after the merger of K & K with his corporation and at the trial he stated that he had never seen the Dodge Charger which he received in the distribution of the racing assets and had no idea of what it was worth. These factors clearly indicate that both of the parties responsible for K & K's business affairs considered its racing activities as being only incidental to its insurance business and the possibility of treating such activities as a separate business was obviously an afterthought. In the past, two major factors have been used in determining whether or not more than one business was being conducted in a corporation. Blaschka v. United States,184 Ct. Cl. 264, 393 F.2d 983, 989-991 (1968). The first is that each purported business must produce a substantial part of the combined corporate income. Second, there must be a separation of supervision and control. *310 Mains v. United States,508 F.2d 1251 (6th Cir. 1975). Petitioner hinges his argument for a separate business primarily on the objective of profit K & K had in undertaking the racing venture. He contends that this objective, plus the amount of time he spent on the activity, proves that it was a separate business as defined in section 346(b). For support, he relies on Bolt v. Commissioner,50 T.C. 1007 (1968). In Bolt, we examined certain racing activities to determine whether they constituted a trade or business for purposes of section 162. We set out a number of factors to be taken into consideration, including the time devoted by the taxpayer to the activity, the manner in which the records were kept, and the conduct of the operation for the purpose of making a profit. 50 T.C. at 1013. All of these factors including the objective of a profit were given equal consideration and no particular one was considered more important than the others. We have already noted the petitioner's failure to produce records to demonstrate the amount of income and expense associated with K & K's racing activities. We have also noted the serious *311 conflict in the record as to the amount of time he devoted to the racing activities. We conclude, therefore, that on this record he has failed to satisfy the standards set forth in Bolt and Blaschka, and failed to establish that the racing venture was conducted by K & K as a separate business within the meaning of section 346(b). Although the distribution does not qualify under section 346(b), it may still qualify as a partial liquidation under section 346(a)(2) if it results in a genuine corporate contraction. See S. Rept. No. 1622, 83rd Cong., 2d Sess. 49 (1954). The hallmarks of such a contraction are a significant reduction in the capital committed to the corporation's business and a corresponding reduction in corporate activity. Mains v. United States,508 F.2d 1251 (6th Cir. 1975); Ballenger v. United States,301 F.2d 192, 195 (4th Cir. 1962); Estate of Chandler v. Commissioner,22 T.C. 1158, 1164 (1954), affd. 288 F.2d 909 (6th Cir. 1955); Viereck v. United States,3 Ct. Cl. 745 (1983), 52 AFTR 2d 83-6350, 83-3 USTC par. 9664; sec. 1.346-1(a), Income Tax Regs. In Mains, the Court *312 of Appeals described the rationale for this standard: Because a distribution qualifying under section 346(a)(2) possesses many of the characteristics of a dividend taxed at ordinary income rates, the sale or distribution of assets claimed to constitute a corporate contraction must be a significant event in the history of the corporation if sale or distribution of assets is not to become a convenient pretext for bailout of earnings and profits at capital gain rates. [Citation omitted.] 508 F.2d at 1255. Petitioner also has the burden of proving that a corporate contraction resulted in this case from the distribution of the racing assets. Welch v. Helvering,supra; Rule 142. On this point the record contains no evidence of the value of the corporation on the date of the distribution except petitioner's estimate that its value at that time was approximately $1,000,000 to $1,500,000. The stipulated net value of the assets distributed was $60,000. Consequently, the distribution resulted in a reduction in the corporation's estimated value of only four to six percent which is not a significant reduction in the corporation's capital. It is apparent, *313 therefore, that the petitioner has failed to carry his burden that the distribution resulted in a genuine corporate contraction. We conclude that under the circumstances the distribution did not qualify as a partial liquidation under section 346 but instead was essentially equivalent to a dividend. [10]
Valuation of the Dodge Charger
The parties agree that the ultimate recipient of Number 71, the National Motorsports Hall of Fame, qualifies under section 170(c) to receive deductible contributions. In general, they also agree as to the applicable principles of law which are as follows: (1) The amount of a contribution made with property is the fair market value of the property at the time of the gift and for such purpose the definition of fairmarketvalue is the classic one of "the price at which the property would change hands between *314 a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having a reasonable knowledge of relevant facts." See United States v. Cartwright,411 U.S. 546 (1973); sec. 1.170A-1(c)(2), Income Tax Regs.
(2) A limited market for the property is not a barrier to valuation. Dellinger v. Commissioner,32 T.C. 1178, 1185 (1959); Publicker v. Commissioner,206 F.2d 250, 254 (3rd Cir. 1953), cert. denied 346 U.S. 924 (1954). (3) Uniqueness is also not a barrier. Cupler v. Commissioner,64 T.C. 946 (1975). (4) In determining value, consideration may be given to all relevant facts and circumstances. Cupler v. Commissioner,supra; sec. 25.2512-1, Gift Tax Regs. (5) The use to which donated property will be put is a relevant fact in determining value. Guggenheim v. Rasquin,312 U.S. 254, 258 (1941). The record does not contain any separate evidence by the respondent as to the value of the Dodge Charger on December 10, 1977, the date of the contribution. Instead he elected to stand on the stipulated value of $25,000 as of June 15, 1976, and *315 on brief maintains that the petitioner has failed to carry his burden of proving that the value of the car increased between the stipulated date and the date of the contribution with the possible exception of the restoration expenses of $10,000. The success or failure of respondent's strategy depends upon the admissibility and/or probative weight to be given to the testimony and appraisal report of petitioner's expert, M. H. Gould. At the trial respondent objected to the admission of Mr. Gould's testimony and report on the ground that he was not qualified to give an expert opinion because (1) he displayed some lack of familiarity with the defendant of fair market value as set forth in sec. 1.170A-1(c)(2), Income Tax Regs.; [11] (2) he stated that it would have been difficult if not impossible on the date of the contribution to have found a buyer for the car at the value which he placed on it; and (3) he had never taken any formal courses in appraising. We reserved a ruling on respondent's objection in order to permit the parties to brief the question. We have concluded, however, that the testimony and report are admissible for the reasons set forth hereinafter. *316 Rule 702 of the Federal Rules of Evidence provides that: If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise. The Advisory Committee Notes to Rule 702 indicate that an expert is not to be viewed in the strict sense of the word, such as a physician, a physicist, or an architect, but the term is to extend to any witness who possesses a specialized skill or understanding of the subject matter involved in the dispute. Our only concern in determining the qualification of an expert is whether his knowledge of the subject matter will assist us in arriving at the truth. Gaps in his knowledge will not disqualify him but will be taken into consideration in the weight given to his testimony or appraisal. Ellis v. K-Lan Co., Inc.,695 F.2d 157 (5th Cir. 1983); Mannino v. International Mfg. Co.,650 F.2d 846 (6th Cir. 1981). Unlike the common law, where expert testimony was admissible *317 only when the trier of fact could not resolve the issue without technical assistance, the Federal Rules of Evidence have adopted the broader view that expert testimony should be admitted at any time it will assist the Court in understanding the evidence or in determining a fact in issue. United States v. Barker,553 F.2d 1013, 1024 (6th Cir. 1977). Furthermore, a witness may qualify as an expert without any particular study or training and without membership in any professional organization. Tank v. Commissioner,270 F.2d 477, 478 (6th Cir. 1959). The critical factor in determining the admissibility of his testimony is his actual experience and the expected probative value of his opinion. Jenkins v. United States,307 F.2d 637 (D.C. Cir. 1962). Finally, it is well established that a dealer in personal property is recognized as competent to give an opinion of market value of the type of property in which he deals. Publicker v. Commissioner,supra.
In this case we find that Mr. Gould, a former stock car driver, has had extensive experience in buying and selling collector cars, including race cars. Over a twenty-seven *318 year period he has restored, traded, appraised, bought, sold and otherwise dealt with all kinds of automobiles including 30 to 35 race cars. He has judged numerous car shows and has been designated a master or supervisory judge for car shows and auctions. He belongs to a number of collector car clubs as well as NASCAR, and has served at various times as an officer in many of these associations. He belongs to the International Society of Appraisers and is an official appraiser of collector cars. Over the years he has appraised hundreds of such cars. He has appraised 20 or 25 race cars for individuals and he performs approximately 30 to 50 appraisals per year. From his experience, knowledge and skill, we are satisfied that Mr. Gould was qualified as an expert to testify on the value of stock car Number 71. In Mr. Gould's opinion the car on the date of its contribution had a value of $150,000. His opinion was based upon information generally relied on in the business of appraising collectible cars, including race cars. His approach to appraising an antique or collector car was to use market or replacement value. His appraisal of Number 71 was also based on its restoration to *319 the way it looked when it set the world records in 1970 and 1971; its historical significance as a record-setting race car, including the probability that some of these records would never be broken because of more restrictive NASCAR rules governing the allowable cubic inch displacement of stock car engines; [12] and its high public exposure. His valuation was also influenced somewhat by the fact that the car was to be contributed to a museum where it would be viewed by at least 250,000 people annually rather than to a collector. Mr. Gould attached significance also to the fact that the car had been exhibited nationwide in 1972 and that the public ceremony surrounding the presentation of Number 71 to the museum received extensive radio and television coverage. In final analysis he concluded that this Dodge Charger Daytona was a unique and irreplacable car and a true historical monument to the sport of stock car racing. *320 Mr. Gould did not personally inspect the car before preparing his report but he reviewed photographs of it and the record of its performance. He was already somewhat aware of its exploits from having read about it in various racing publications. He also spoke with other collectors and persons knowledgeable in the field of collecting race cars. He concluded that there was not a comparable car because of the unique historical value of Number 71. Prior to trial Mr. Gould inspected the car at the museum and testified that the vehicle had undergone a ground-up restoration to complete racing condition and that nothing he observed changed his opinion of its value as of the date of the contribution to the Hall of Fame. Mr. Gould readily admitted that he knew of no sale of a car which he considered comparable to Number 71 but in general support of his valuation, he submitted data on a number of cars, including both collector and antique cars, which he had bought and sold over the years as a dealer. One of his data cards showed a 1922 restored stock car which had no particular history but was offered at $25,000. Another exhibit showed a 1930 Cadillac which he purchased for $100,000 *321 and sold 10 days later to another dealer for $110,000. Mr. Gould also cited a 300 SL gullwing Mercedes, which had been used for racing, and which he purchased for $30,000 and sold at a sports car auction for $40,000 in less than two years. In 1977 he bought an Allard Roadster for $25,000 and sold it in 1982 for $55,000. These examples were not presented by Mr. Gould as comparable sales but only as an indication of the overall value and volatile nature of collector cars. Moreover, his data was admittedly restricted to mostly collector and antique cars which are not comparable to stock cars because, as he stated, in 1977 there was not yet a collector's market for stock cars. With regard to his conclusion that in June of 1976, Number 71 had a value of only $25,000, Mr. Gould testified that while the car had the same unique history at that time as it had in December of 1977, no particular value could be assigned to the history on the earlier date because of the car's condition. In his opinion its dilapidated state at that time eliminated any interest by a museum and any value associated with its history. Even though, as previously noted, the respondent has not presented any separate *322 evidence of value on the date of the contribution which is contrary to Mr. Gould's opinion, we are not required to accept his opinion at face value. See Dayton Power & Light Co. v. Public Utilities Commission,292 U.S. 290, 300 (1934). In fact, we are required to evaluate his testimony and report in the light of the entire record and our own judgment. Cupler v. Commissioner,supra.
However, in this case, as in many evaluation cases, the Court has been left by the parties with no factual basis upon which to find a value for the gift between the $25,000 to $35,000 figure urged by respondent and the $150,000 figure advanced by the petitioner. See Buffalo Tool & Die Mfg. Co. v. Commissioner,74 T.C. 441 (1980). However, in the exercise of our own judgment we are satisfied that there is no merit to respondent's argument that Number 71 was not worth any more after its restoration than it was before plus the cost of its restoration.[13] A car with the history of Number 71 would obliviously be worth a great deal more when completely restored to its former racing condition, than the value of a pile of partially disassembled parts covered *323 with rust and imbedded with salt plus the discounted cost of reassembling. Using our best judgment on the record before us and giving substantial weight to the creditable and uncontradicted testimony of Mr. Gould, we conclude that the value of the car on the date of its donation to the Hall of Fame was $100,000. To reflect concessions as well as the foregoing, Decision will be entered under Rule 155.
Footnotes
1. By an amendment to the respondent's answer, the deficiency for 1976 was increased to $9,657.00 to reflect the parties' agreement as to the increased value of a stock car distributed to petitioner in that year.↩
2. All section references are to the Internal Revenue Code of 1954, as amended, and in effect during the years in issue. All rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.↩
3. The agreement provided: K & K Insurance Agency, Inc. has agreed to transfer all tangible personal property, all books and records, all contracts of improvement, contracts with NASCAR, all equipment, rolling stock, tools and vehicles, etc. (Except the Bonneville Salt Flat Record Car, which is to be transferred to Nord Krauskopf) to Auto Racetracks, Inc. K & K Insurance Agency, Inc. agrees that one other race car is hereby transferred to Greg C. Mosher and now has proper engine and equipment for Grand National Championship racing. Greg C. Mosher is to determine final sale price of his race car. Greg C. Mosher will avail himself for work in public relations and solicitation of a sponsor. It is further agreed that if Greg C. Mosher makes a significant contribution in the above area, he will be paid a fee from Auto Racetracks, Inc. The partners agree that if Auto Racetracks, Inc. sold the racing interests and produced sizeable profits over and above all accrued expenses for Auto Racetracks, Inc., Greg C. Mosher would receive a portion of that acquired money from Auto Racetracks, Inc. Auto Racetracks, Inc. agrees to perform the racing obligations to NASCAR to run the races submitted for the balance of the season, and to continue the employment of the crew and other race employees for the balance of the season but no later than December 31, 1977, and that the race shall be run and the car shall carry the K & K designation and number, and shall do such other things incidental to the racing program as are necessary to preserve the K & K national image. Nord Krauskopf agrees to lend and provide to Auto Racetracks, Inc. such funds as are necessary to enable Auto Racetracks, Inc. to carry out these obligations. It is further agreed that at the end of the year, the NASCAR point funds will be split between Auto Racetracks, Inc. and K & K Insurance Agency, Inc., based on the number of races in which a car participated for K & K from January 1, 1976 until June 15, 1976 and until January 1, 1977. The division of money would be on total after the driver's share has been deducted.↩
4. The deduction was calculated as follows: Appraised Value
$165,000
Depreciated Value When
Received, June 1976
Basis for Calculation
$165,000
Factor for Long Term
50%
Charitable Deduction
$ 82,500
* Donated - December 15, 1977 * No conditions to donation * Race car received when assumption of liabilities for racing engagements was assumed in June, 1976. No remaining depreciable value at that time.↩
5. The substance of section 346 was changed in 1982 to apply only to noncorporate shareholders. See section 302(b)(4). New section 302(e), applicable to distributions occurring after August 31, 1982, has replaced former section 346. See section 222(c), Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97-248, 96 Stat. 324, 478.↩
6. Section 346(a) states in part: (a) In General.--For purposes of this subchapter, a distribution shall be treated as in partial liquidation of a corporation if-- * * * (2) the distribution is not essentially equivalent to a dividend, is in redemption of a part of the stock of the corporation pursuant to a plan, and occurs within the taxable year in which the plan is adopted or within the succeeding taxable year, including (but not limited to) a distribution which meets the requirements of subsection (b). ↩
7. Section 346(b) states: (b) Termination of a Business.--A distribution shall be treated as a distribution described in subsection (a)(2) if the requirements of paragraphs (1) and (2) of this subsection are met. (1) The distribution is attributable to the corporation's ceasing to conduct, or consists of the assets of, a trade or business which has been actively conducted throughout the 5-year period immediately before the distribution, which trade or business was not acquired by the corporation within such period in a transaction in which gain or loss was recognized in whole or in part. (2) Immediately after the distribution the liquidating corporation is actively engaged in the conduct of a trade or business, which trade or business was actively conducted throughout the 5-year period ending on the date of the distribution and was not acquired by the corporation within such period in a transaction in which gain or loss was recognized in whole or in part. Whether or not a distribution meets the requirements of paragraphs (1) and (2) of this subsection shall be determined without regard to whether or not the distribution is pro rata with respect to all of the shareholders of the corporation.↩
8. Section 1.346-1(c), Income Tax Regs., provides in part: The term "active conduct of a trade or business" shall have the same meaning in this section as in paragraph (c) of section 1.355-1↩.
9. The lack of adequate recordkeeping is a factor to be considered in determining whether or not two separate businesses existed. See Elliott v. Commissioner,32 T.C. 283, 291 (1959). Cf. Demler v. Commissioner,T.C. Memo. 1966-117↩.
10. Having determined that the distribution failed the first test of section 346(a)(2), we need not inquire as to the other elements of that section such as whether a part of the stock was redeemed pursuant to a plan which occurred within the taxable year or succeeding taxable year within which the plan was adopted.↩
11. Section 1.170A-1(c)(2), Income Tax Regs., states in relevant part: (2) The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having a reasonable knowledge of relevant facts. Mr. Gould defined the term as, "Fair market value is what somebody will take and somebody will give."↩
12. For example, in 1971 and thereafter the Dodge Charger Daytona was limited to a maximum engine size of 305 cubic inches under rules adopted by NASCAR. The engine in Number 71 was 426 cubic inches and in 1971 K & K had to insert a restricter plate in its carburetor before it could compete with the smaller engines under the rules.↩
13. The fallacy in this argument would be recognized instantly by any antique dealer (and the number is great) who has paid a nominal sum for a piece of solid walnut furniture well camouflaged with green barn paint and sold the same for several hundred dollars after doing nothing more than applying a few dollars worth of Formby's paint remover.↩