T.C. Memo. 1995-596


UNITED STATES TAX COURT


ASSOCIATION CABLE TV, INCORPORATED, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 9421-93.          Filed December 18, 1995.


<u>H. Cranston Pope</u>, for petitioner.

<u>Alan Friday</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

COHEN, <u>Judge</u>:  Respondent determined a deficiency of
$136,903 in petitioner's Federal income taxes for 1988 and
additions to tax of $102,677 under section 6653(b)(1) and $34,226
under section 6661.  In the answer, respondent alleged, in the
alternative, that petitioner is liable for additions to tax for
delinquency and negligence under sections 6651(a)(1) and
6653(a)(1), respectively.  Unless otherwise indicated, all
section references are to the Internal Revenue Code in effect for
the year in issue, and all Rule references are to the Tax Court
Rules of Practice and Procedure.

The issues for decision are whether petitioner is taxable on a gain on the sale of assets or whether it adopted a plan of complete liquidation on or before the sale date of the assets in accordance with the requirements of section 337 and whether petitioner is liable for the additions to tax determined by respondent.

## FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. Petitioner had its principal place of business in Florida at the time the petition was filed. During the year in issue, petitioner was in the business of providing cable TV service.

Association Cable TV (ACT) was incorporated in 1985. The corporation was owned equally by four shareholders: Franklin W. Briggs (Briggs), John L. Daniell (Daniell), Jimmy D. Morris (Morris), and Mike Gay (Gay). The corporation was formed to provide cable TV services to a beach resort. Subsequently, ACT pursued and received franchise rights to provide cable TV services to Panama City Beach, Florida. The franchise for Panama City Beach put ACT in competition with Jones Spacelink, Ltd. (JSL), which also provided cable TV services in the area. In October 1988, JSL expressed an interest in purchasing ACT assets, which consisted of franchise rights. The shareholders of ACT held an 11:00 a.m. meeting on October 24, 1988, to discuss the offer from JSL and other ACT business. The meeting was held at

the office of Glenn Hess (Hess), ACT's attorney.  As was customary, the meeting was tape-recorded and later transcribed.  Various topics were discussed during the meeting.  The shareholders discussed the offer from JSL and voted to sell ACT's cable TV franchise rights to several geographical areas to JSL if JSL would agree to a sales price of approximately $1.5 million.  As part of the negotiations, JSL requested a noncompetition agreement with ACT.  The following was recorded:

> HESS:  * * * they [JSL] ask for a contract with HARBORTOWN, they ask for a contract with PIRATES COVE....

> BRIGGS:  We can't give them HARBORTOWN, PIRATES COVE, we'll just say that it will be covered by the non-competing agreement.

>     *     *     *     *     *     *     *

> DANIELL:  * * * [I]t [the noncompetition agreement] covers what area?

> HESS:  Uh yes, Hathaway Bridge, Phillips Inlet Bridge, Dellwood Beach Road and the State Park, Gulf of Mexico...  If I say the Intercoastal Waterway, I think they'll get a real great desire to build in West Bay.

> DANIELL:  In other words, it doesn't cover Bay County, it's just ...

> HESS:  No, I defined it specifically, Hathaway, Dellwood Road, and the State Park on the east, Phillips Inlet on the west, the Gulf and the Intercoastal Waterway, which is a good boundary along here, and I got a map showing that will be it for a period of 5 years.

The shareholders discussed business plans for ACT that were to occur whether or not the sale to JSL was completed.  They also discussed the interpersonal problems they had been having and the

possibility of disassociating themselves.  The meeting ended with plans for Hess, Briggs, Morris, and Daniell to travel to Colorado to meet with JSL.  The ACT shareholders (except Gay) and Hess met with JSL in Colorado on October 27, 1988.

ACT employed the firm of Williams, Cox, Weidner & Cox (WCWC) as their accountants.  Prior to traveling to Colorado, ACT contacted WCWC regarding the possible sale of ACT assets to JSL.  Mack Shepard (Shepard) and Joel Turner (Turner) were both accountants at WCWC.  Shepard had been handling the ACT account.  Shepard asked Turner to research various options on how ACT could structure the contemplated JSL sale from a tax perspective.  Turner researched the issue and prepared a memorandum that outlined several alternative methods on how to structure the sale, including liquidation.  Turner faxed the memorandum to Briggs, Morris, Daniell, and Hess in Colorado on October 27, 1988.

After sending the fax, Turner did not communicate with any ACT shareholders until December 1989, over a year after the sale to JSL.  Hess was not a tax attorney and did not advise ACT with regard to the tax consequences of the sale.

Hess, Briggs, Morris, and Daniell finalized the sale of ACT assets to JSL in Colorado on October 27, 1988.  The final sales price was $1,522,080, which included the sum of $500,000 for a noncompetition clause.  The agreement stated in part:

> 1.  Each Seller covenants and agrees with Buyer
> that for a period of five years from and after the date
> hereof, each Seller shall not, directly or indirectly,
> own, control, manage, operate, join, participate in the
> ownership, management, operation or control of, or be
> connected in any manner * * * anywhere within all
> geographic areas which are covered by or which Buyer
> has a right to serve under any cable television
> franchises or other agreements within the State of
> Florida currently held by the Buyer or any of its
> affiliates or granted to Buyer or any of its affiliates
> within five years from the date hereof, except for
> (i) the communities of Mexico Beach and Deer Point
> Lake, both in Bay County, Florida, Port St. Joe in Gulf
> County, Florida and Apalachicola in Franklin County,
> Florida, and (ii) any other communities within the Bay
> County, Florida franchise area which are not served or
> proposed to be served by Buyer or any of its affiliates
> and which have been offered to and refused by Buyer
> pursuant to the Service Agreement.  The parties
> acknowledged that Sellers may build cable television
> systems for the communities of Mexico Beach and Deer
> Point Lake, both in Bay County, Florida, Port St. Joe,
> in Gulf County, Florida and Apalachicola in Franklin
> County, Florida and such shall not be construed as a
> violation of this Covenant Not to Compete.  * * *

On December 28, 1988, Gay went to Hess' office and asked Hess to prepare minutes reflecting that on that day the shareholders of ACT voted to liquidate the corporation.  Hess prepared the minutes, which included resolutions that the board of directors and shareholders of ACT voted to liquidate and dissolve the corporation in accordance with section 337 of the Internal Revenue Code of 1954.  No meeting or other action of the shareholders occurred on December 28, 1988.  Gay died several weeks after the meeting with Hess.

In October 1989, ACT's 1988 Form 1120 tax return had not yet been prepared by WCWC.  Shepard wrote a memorandum to Briggs on

October 11, 1989, summarizing previous discussions between Briggs and Shepard on the treatment of the funds that ACT received from JSL as a result of the sale. The memorandum did not mention liquidation. In December 1989, WCWC began preparing ACT's 1988 Form 1120 tax return. WCWC was operating under the assumption that ACT had not liquidated. After WCWC prepared a draft of ACT's return, WCWC informed Briggs that a substantial tax liability would be owed on the funds received from the JSL sale.

Briggs was angry about ACT's tax liability and expressed his anger to WCWC. In response, J. Vern Williams (Williams), a manager at WCWC, contacted Turner and asked Turner to get involved with the ACT tax return. WCWC removed Shepard from working with ACT and asked Shepard to resign. In a memorandum dated December 18, 1989, Turner informed Williams that Turner had previously advised ACT to liquidate. Turner was referring to the October 27, 1988, memorandum that he had prepared for the ACT shareholders while they were in Colorado. Turner sent Williams a copy of the 1988 memorandum that he had prepared for the ACT shareholders.

Turner prepared a December 18, 1989, memorandum to ACT in anticipation of a meeting between Turner and Briggs later that day. In the December 18, 1989, memorandum to ACT, Turner stated: "We recommended a liquidation of the corporation by January 31, 1989, to qualify for the transitional rules pertaining to a tax free liquidation under 'old code section 337'." During the

December 18, 1989, meeting, Turner informed Briggs that minutes of a liquidation meeting were needed for submission to the IRS with ACT's 1988 Form 1120 tax return.

On December 26, 1989, Turner faxed to Briggs a sample set of minutes to be used for a corporate liquidation. The sample minutes provided by Turner erroneously listed January 31, 1989, as the date by which liquidation must be completed. On January 16, 1990, minutes purporting to represent a meeting during which the shareholders of ACT agreed to liquidate arrived at WCWC's office. The minutes falsely stated that a meeting occurred on October 24, 1988, at 1:00 p.m. and referred to the erroneous date of January 31, 1989, as the date by which liquidation must be completed. Bill Bass (Bass), an accountant at WCWC, received the minutes when they arrived at WCWC. Bass felt apprehensive about the minutes but was instructed by Turner to take the minutes at face value. Bass attached the minutes to ACT's 1988 Form 1120 tax return and filed the return with the IRS. The false minutes were prepared by Briggs and Morris between December 26, 1989, and January 16, 1990.

Daniell resigned as president of ACT on May 7, 1990. In November 1990 and January 1991, Daniell was interviewed by the IRS in connection with an IRS investigation of Briggs. Daniell told the IRS, during the January 1991 meeting, that the first time he found out that ACT had supposedly liquidated was during

the November 1990 meeting with the IRS. Daniell never participated in a vote to liquidate ACT.

In 1994, Briggs and Morris pleaded guilty to and were sentenced for violations of 26 U.S.C. sec. 7207 (1988) for false statements in income tax returns.

## ULTIMATE FINDINGS OF FACT

Petitioner did not adopt a plan of liquidation prior to or on the sale date of its assets.

Petitioner was liable for the tax on the gain on the sale of its assets.

At the time that petitioner's 1988 Form 1120 tax return was due, officers of petitioner knew they were liable for the tax on the gain from the sale.

Petitioner filed a false 1988 Form 1120 tax return with the IRS that did not report the gain with the intent to evade a tax known to be owing.

## OPINION

Petitioner asserts that it had adopted an informal liquidation plan on or before the sale date of its assets and, therefore, the $405,776 gain that was realized on the JSL sale was nontaxable. Petitioner admits that it did not adopt a formal liquidation plan because the minutes attached to the return were created after the sale, backdated, and contained false information.

Respondent contends that petitioner had not timely adopted a liquidation plan and that the gain was taxable.  Respondent acknowledges that a formal written liquidation plan is not required under section 337.  Respondent argues, however, that the evidence establishes that an informal plan was not adopted. Petitioner has the burden of proving that respondent's determination of unreported income is erroneous.  Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992). Respondent, however, must prove by clear and convincing evidence an underpayment of tax, as well as fraudulent intent, in relation to the addition to tax for fraud.  Secs. 6653(b)(1), 7454(a); Rule 142(b).

Gain on Sale

The nonrecognition of gain or loss provisions of section 337 in connection with corporate liquidations were repealed by the Tax Reform Act of 1986, Pub. L. 99-514, sec. 633(d), 100 Stat. 2085, 2280.  A transition rule allowed certain small corporations to be eligible for section 337 nonrecognition for a longer period.  ACT was eligible for the transitional exemption, provided that the liquidation was completed before January 1, 1989.  Section 337 as it applied to ACT provided as follows:

> SEC. 337.  GAIN OR LOSS ON SALES OR EXCHANGES IN CONNECTION WITH CERTAIN LIQUIDATIONS.
>
>     (a) General Rule.--If, within the 12-month period beginning on the date on which a corporation adopts a plan of complete liquidation, all of the assets of the corporation are distributed in complete liquidation,

less assets retained to meet claims, then no gain or loss shall be recognized to such corporation from the sale or exchange by it of property within such 12-month period.

ACT was required to adopt a liquidation plan on or before the sale date of its assets.  Liquidation is a process distinct from other corporate action.

The liquidation of a corporation is the process of winding up its affairs by realizing upon its assets, paying its debts, and appropriating the amount of its profit and loss.  It differs from normal operation for current profit in that it ordinarily results in the winding up of the corporation's affairs, and there must be a manifest intention to liquidate, a continuing purpose to terminate its affairs and dissolve the corporation, and its activities must be directed and confined thereto.  A mere declaration is not enough, and the question whether a corporation is in liquidation is one of fact.  * * *  [T.T. Word Supply Co. v. Commissioner, 41 B.T.A. 965, 980-981 (1940).]

The intent to liquidate must be adopted in a plan.  A plan is a method of putting into effect an intention or proposal.  Burnside Veneer Co. v. Commissioner, 167 F.2d 214, 217 (1948), affg. 8 T.C. 442 (1947).  The statute does not require a formal plan. Mountain Water Co. v. Commissioner, 35 T.C. 418, 426 (1960). However, if there is no formal plan, the adoption date of a liquidation plan is determined from the facts and circumstances. Id.; sec. 1.337-2(b), Income Tax Regs.  The facts and circumstances must provide clear evidence of an intention to liquidate if an informal plan is to be established.  Blaschka v. United States, 184 Ct. Cl. 264, 393 F.2d 983, 988 (1968).

Both petitioner and respondent rely on the October 24, 1988, 11:00 a.m. meeting and the events on the day of the sale to JSL to substantiate their assertions. Respondent contends that the transcript of the October 24, 1988, 11:00 a.m. meeting contains no reference to liquidation and establishes that petitioner intended to continue business. Respondent relies on the shareholders' discussion about which geographical areas to exclude from the noncompetition agreement in the JSL contract and the subsequent exclusion of those areas in the contract.

Petitioner argues that the noncompetition agreement was added at the request of JSL and therefore is not evidence of an intent to continue business. Petitioner fails to acknowledge, however, that it was the ACT shareholders who specified which areas they wanted excluded from the agreement. The specified areas excluded from the agreement with JSL covered the same areas as the ACT cable TV franchise rights contracts that were not sold to JSL.

Further evidence of ACT's intention to continue business are Briggs' statements during the October 24, 1988, 11:00 a.m. meeting. Briggs stated: "Well, the corporation will still be alive after this [the JSL sale]. Because the corporation also still has the county franchise in it." Referring to the county franchise and the contracts excluded from the noncompetition agreement, Briggs stated: "Sooner or later we are gonna have to build the system or else total credibility is gone. And this is

whether we sell to [JSL] or don't sell to [JSL]."  Emphasis added.

Petitioner relies on the shareholders' discussion on the discord that existed between them during October 1988 as evidence of the shareholders' intention to liquidate.  Briggs stated at the October 24, 1988, 11:00 a.m. meeting:  "I just think it is better off if we sell that company and we all go our ways after that.  I think it will work better."  This statement is merely Briggs' thoughts at the time and does not amount to a "plan" or a "clear intention to liquidate" on the part of all or a majority of the shareholders.

The events on the day of the JSL sale are similarly inadequate to establish an informal plan of liquidation.  Regarding the memorandum that Turner faxed to the shareholders in Colorado on the day of the sale, petitioner argues:  "Even lacking the specific words, 'WE RECOMMEND LIQUIDATION', the Memorandum can be taken to so recommend, at least in the common experience of almost everyone."  The memorandum from Turner to the ACT shareholders in Colorado stated in part:

> If a plan of liquidation is adopted, it appears that a significant amount of a gain will not be recognized at the corporate level provided the plan of liquidation is adopted and the liquidation process is completed prior to January 1, 1989.  * * *

Respondent argues that, given the text of the memorandum, it is entirely likely that the shareholders decided to leave the decision of whether to liquidate or not for later.  Respondent's

position is supported by Turner's failure to mention in his memorandum the timing requirement of section 337, that a liquidation plan must be adopted on or before the sale date of the assets. See sec. 1.337-2, Income Tax Regs. Petitioner presented no evidence that its shareholders were aware of the timing requirement. The shareholders' lack of knowledge of the time requirement negates an indication that they intended to act in conformity therewith. Briggs testified that he did not know anything about liquidations prior to the sale. Hess testified at trial that he was not ACT's tax adviser and did not provide ACT with tax advice on the day of the sale or at any other time.

Respondent's position that ACT's decision to liquidate was postponed until after the sale is supported by Daniell. Daniell informed the IRS during the November 1990 interview that, after receiving Turner's memorandum in Colorado, he, Morris, and Briggs left the decision to liquidate "up in the air" and that they planned to resolve the liquidation issue at a later date.

The shareholders' actions subsequent to the sale also fail to establish that the shareholders adopted an informal liquidation plan prior to or on the sale date to JSL. Respondent points to the liquidation minutes that Gay had Hess prepare on December 28, 1988. The minutes stated that the ACT shareholders had voted to liquidate ACT on December 28, 1988, which was 2 months after the sale to JSL. Although these minutes were not submitted to the IRS, respondent argues, and we agree, that this

action undermines any claim that the shareholders had informally agreed to liquidate in October 1988.

Briggs had several conversations with Shepard in October 1989, prior to WCWC's preparing ACT's 1988 Form 1120 tax return. During those conversations, Briggs did not tell Shepard that ACT had voted to liquidate. Briggs' failure to inform WCWC that ACT had voted to liquidate until after Briggs was informed by WCWC that there would be a large tax liability if ACT had not liquidated also undermines a claim that ACT had informally adopted a liquidation plan prior to the JSL sale.

Petitioner relies on Mountain Water Co. v. Commissioner, 35 T.C. at 426, to support finding an informal liquidation plan based on facts and circumstances. In Mountain Water Co., the sole asset was land that provided water for the company's water business. The shareholders lost the land when it was condemned by the State. The directors of the company had recognized that, when the land was condemned, the purpose for the existence of the company would cease. After the condemnation, the corporation filed a certification of dissolution with the State and wound up its affairs. This Court found that there was no question that there was a good faith intention to liquidate the corporation completely.

The instant case is distinguishable from Mountain Water Co. The sale to JSL did not require a cessation of ACT's business. The ACT shareholders had plans to continue ACT business whether

or not the sale to JSL was completed.  Additionally, the sale of ACT's assets to JSL did not constitute a sale of ACT's sole asset because ACT still had outstanding contracts.

Respondent has proven by clear and convincing evidence that ACT had not adopted an informal plan of liquidation as required by section 337.  Petitioner has admitted that the minutes that were provided to the IRS with ACT's 1988 Form 1120 tax return were false because they were created after the sale, backdated, and documented a meeting that did not occur.

Because neither a formal nor an informal plan of liquidation existed prior to or on the sale date of the ACT assets to JSL, ACT is ineligible for the nonrecognition provisions of section 337; therefore, ACT must recognize gain on the sale of its assets to JSL.

## Additions to Tax

The addition to tax in the case of fraud is a civil sanction provided primarily as a safeguard for the protection of the revenue and to reimburse the Government for the heavy expense of investigation and the loss resulting from the taxpayer's fraud. Helvering v. Mitchell, 303 U.S. 391, 401 (1938).  In addition to proving an underpayment, as discussed above, respondent must prove that petitioner failed to report the gain on the sale of its assets with the intent to conceal, mislead, or otherwise prevent the collection of tax.  See Stoltzfus v. United States,

398 F.2d 1002, 1004 (3d Cir. 1968); Webb v. Commissioner, 394 F.2d 366, 377 (5th Cir. 1968), affg. T.C. Memo. 1966-81.

The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud will never be presumed. Beaver v. Commissioner, 55 T.C. 85, 92 (1970). Fraud may, however, be proved by circumstantial evidence because direct proof of the taxpayer's intent is rarely available. The taxpayer's entire course of conduct may establish the requisite fraudulent intent. Stone v. Commissioner, 56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner, 53 T.C. 96, 105-106 (1969).

Intent may be inferred from various kinds of circumstantial evidence, or "badges of fraud", including an understatement of income, false statements or documents, concealment of assets or covering up sources of income, and implausible or inconsistent explanations of behavior. Spies v. United States, 317 U.S. 492 (1943); Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601. In this case, respondent's strongest evidence is petitioner's falsification of documents to corroborate its version of the events in the year in issue and other conduct during the preparation of petitioner's 1988 tax return.

Although a formal plan of liquidation was not required under section 337, petitioner represented to the IRS that it had

adopted a formal plan of liquidation when it attached false minutes to its 1988 tax return and did not report income from the sale of assets to JSL. Respondent argues that the false minutes are evidence of an actual, intentional wrongdoing for the specific purpose of evading taxes.

Petitioner argues that the minutes are not evidence of fraud but evidence of the shareholders' intention to comply with the tax laws. In support of its position, petitioner addresses the backdated minutes and argues on brief:

> There were inaccuracies in the writing [minutes] which clearly indicated the plan was prepared after the fact and back-dated to appear as though it were prepared in anticipation of the liquidation. This, the Commissioner argues, is proof not only that no plan existed, but also of an intent to defraud the government. More likely it is simply what happens when a taxpayer attempts to prepare a tax sensitive and very technical document without benefit of counsel. Experienced counsel could have easily prepared the plan without the appearance of fraud by simply dating it currently and referring to an earlier meeting. The irony is that the law does not even require a written plan. All of this trouble arose from the efforts of one man attempting to properly satisfy what he thought was required of him under the law.

We cannot accept petitioner's excuse for creation of the false minutes.

WCWC informed Briggs in December 1989 that ACT would owe a substantial amount of taxes if ACT had not adopted a plan of liquidation prior to or on the date of the sale to JSL. Briggs testified:

> Q But they [the accountants] showed you an ACT return in which there was a lot of tax due.

- 18 -

A  I don't recollect seeing one.  I recollect that they said you have a liability on it--a big liability on it.

Q  Okay.

A  And that is when I think everybody got back together and they got talking to each other up at Williams, Cox and Weidner and whatever in the heck their name is.

Q  When they told you there was a return with a lot of tax due, did that--that got everybody nervous and talking.  True?

A  Well, I think it got--you know, when we raised hell with them and said, Wait a minute now, here.  You were in here from ground floor and all the rest of that and everything.  They went back and got talking amongst themselves, I think.

After Briggs "raised hell" with WCWC, Turner sent to Williams, his manager, a fax that stated in part:

I believe you will agree that we gave them sound advice in October, 1988.  If they did not follow through with the advice, they have a problem, because we did explain the options to them.  Let me hear from you.

ACT would not have had a substantial tax liability from the JSL sale if it had liquidated in accordance with section 337. WCWC's failure to inform the ACT shareholders about the timing requirement of section 337, along with Briggs' anger at WCWC because of the ACT tax liability and Turner's attempt to protect WCWC's interests in the memorandum to Williams, convinces us that ACT had not adopted a liquidation plan prior to or on the sale date of ACT's assets to JSL.

During the December 18, 1989, meeting, Turner informed Briggs that minutes of a liquidation meeting were needed for

submission to the IRS with ACT's Form 1120 tax return.  Briggs testified:

> Q  Did Mr. Turner tell you or give the impression that he needed those documents [the minutes] in order to file the return?
>
> A  Yes.  They should have been filled out.  He said they needed to be filled out, and he gave us a copy of them--really a format.  * * *

Turner subsequently gave Briggs a sample set of minutes to be used for a corporate liquidation.  Briggs and Morris created the false minutes for an October 24, 1988, 1:00 p.m. meeting sometime between December 26, 1989, and January 16, 1990, with their recently acquired information that the plan had to be adopted on or before the sale date of its assets to JSL.

Petitioner contends that the inaccuracies in the minutes are "very technical".  The inaccuracies were not technical and consisted of a false date and time for a meeting that never occurred.  A mistaken date or time on a document does not alone amount to fraud.  We recognize that, although creating documents after an event may be reprehensible, "manufacturing" documents is not tantamount to fraud unless there is a showing that the information in the documents is essentially false.  See Sinko v. Commissioner, T.C. Memo. 1967-45.  However, submitting false documents to the IRS is an indication of fraud.  See Stephenson v. Commissioner, 79 T.C. 995, 1007 (1982), affd. 748 F.2d 331 (6th Cir. 1984).  Where, as here, a taxpayer has knowledge that documents are false and submits income tax returns to the IRS

that are in conformity with the false documents, there is clear and convincing evidence of fraud. See Cantor v. Commissioner, T.C. Memo. 1957-173.

Petitioner relies on Badias & Seijas, Inc. v. Commissioner, T.C. Memo. 1977-118, to support its position that the backdated and erroneous minutes should be overlooked when the motivation for preparing the minutes was mistake or misunderstanding. In Badias & Seijas, a corporation sold its sole asset, a restaurant. The shareholder of the corporation made several errors on the final tax return for the corporation. The errors included failing to indicate that the corporation had sold its sole asset, failing to designate the tax return as a final return, and listing the shareholder as a 50-percent shareholder when he was the 100-percent shareholder. The Court determined that the corporation had adopted an informal plan of liquidation notwithstanding the errors on the tax return, because the errors did not affect the actual events constituting adoption of the plan.

The instant case is distinguishable from Badias & Seijas. The taxpayer's actions in Badias & Seijas conformed to section 337, even if the documents did not. In this case, the minutes are not merely an inaccurate representation of actual events; they are a fabrication of events. Briggs knew that he did not participate in a vote to liquidate ACT on or before the sale date of the assets to JSL, but he prepared minutes to the contrary.

Briggs gave the false minutes to WCWC with the knowledge that the false information would be used to prepare ACT's 1988 Form 1120 tax return for submission to the IRS.

Respondent has met her burden of proof by clear and convincing evidence that petitioner acted with the intention to evade taxes. Accordingly, we sustain respondent's determination that petitioner is liable for the addition to tax for fraud under section 6653(b)(1).

Respondent determined an addition to tax for 1988 under section 6661. Petitioner has the burden of proof on this issue. Rule 142(a). Petitioner did not present any evidence or argument that would avoid application of this addition to tax.

Because we have upheld respondent's fraud determination, we need not examine the alternative additions to tax.

<u>Decision will be entered

for respondent</u>.