T.C. Memo. 2000-381

UNITED STATES TAX COURT

JIMMY D. MORRIS, TRANSFEREE, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 4897-98.                    Filed December 18, 2000.

<u>Graydon W. Florence, Jr.</u>, for petitioner.

<u>Mark S. Mesler</u> and <u>Pamela L. Mable</u>, for respondent.


MEMORANDUM OPINION

THORNTON, <u>Judge</u>:  Respondent has determined that petitioner

has liability as a transferee of Association Cable TV, Inc.

(ACT), of $199,400, plus interest as provided by law.[1]

Respondent determined that for taxable year 1988, ACT has unpaid

_____

[1] The notice of transferee liability, issued to petitioner
on Dec. 9, 1997, determined a liability of $113,767.  In an
amended answer, respondent increased the amount of transferee
liability asserted against petitioner to $199,400.

liability for Federal income taxes of $136,903, and additions to tax pursuant to sections 6653(b)(1) and 6661 of $102,677 and $34,226, respectively.

The issue for decision is whether petitioner is liable as the transferee of assets of ACT under section 6901 and, if so, the amount of his liability.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

## Background

The parties submitted this case fully stipulated without trial.[2] The stipulation of facts is incorporated herein by this reference. When he petitioned the Court, petitioner resided in Panama City, Florida.

In 1985, petitioner, Franklin W. Briggs (Briggs), John L. Daniell (Daniell), and Michael Roy Gay (Gay) incorporated ACT, a Florida corporation that they owned equally. They organized ACT to provide cable television services to a beach resort in Panama City Beach, Florida, where ACT acquired cable television franchise rights. Petitioner was a shareholder, director, and officer of ACT.

---

[2] By joint stipulation, the parties agreed to be bound by the testimony and documentary evidence offered at the trial of Briggs v. Commissioner, T.C. Memo. 2000-380, also decided today.

In October 1988, ACT sold its assets, including cable franchise rights, to Jones Spacelink, Ltd. (JSL). The purchase and sale agreement, executed October 27, 1988 (the purchase agreement), states that it was made by and among JSL, as the buyer, and ACT, Towers Development Co. of Panama City, Inc. (Towers Development), Towers Construction Co. of Panama City, Inc.,[3] Briggs, Daniell, Gay, petitioner, and Sandra Morris, as sellers (identified collectively in the purchase agreement and hereinafter as the seller group). The purchase agreement states that the assets to be conveyed to JSL "include all tangible and intangible assets of the Seller Group". The stated purchase price of $1,522,080 was payable "to the Seller Group". Of this amount, $510,560 was payable to the seller group in cash at the closing, $500,000 was payable to the seller group in accordance with the terms of a covenant not to compete, and the balance of $511,520 was payable to the seller group in accordance with the terms of an agreement regarding additional cable subscribers.

The covenant not to compete, also executed October 27, 1988, states that it was made and entered into by and between JSL, as

---

[3] As discussed in Briggs v. Commissioner, supra, the nominal shareholders of both Towers Development Co. of Panama City, Inc. (Towers Development), and Towers Construction Co. of Panama City, Inc., were Franklin W. Briggs (Briggs) and petitioner's wife, Sandra Morris, petitioner having placed his ownership interests in his wife's name to avoid creditors. In the instant proceeding, the parties have stipulated that petitioner and Briggs were the sole shareholders of Towers Development and that they owned it equally.

buyer, and the "Sellers", comprising the same entities and individuals as the seller group. Under the covenant not to compete, "Each Seller" agreed not to compete with JSL for 5 years. The covenant not to compete states that JSL shall pay the $500,000 consideration for the covenant not to compete "to Sellers, c/o Franklin W. Briggs", with $333,400 payable on October 27, 1988, and the balance payable in four annual installments of $42,400 each, commencing October 27, 1989.

On November 4, 1988, pursuant to an agreement with ACT, JSL made a wire transfer to ACT's attorney, Glenn L. Hess (Hess), of $840,960. Hess deposited these funds into a client trust fund account. Of this amount, $510,560 was the cash payable at the closing, and $330,400 was the initial payment for the covenant not to compete. On November 7, 1988, pursuant to ACT's instructions, Hess issued four checks from the client trust fund account as follows:

| Payee | Amount |
|---|---|
| ACT | $309,666.66 |
| Daniell | 132,823.33 |
| Gay | 132,823.33 |
| Towers Development | 265,646.68 |
| Total | 840,960.00 |

The $265,646.68 check to Towers Development represented distributions to petitioner and Briggs of $132,823.34 each.[4]

---

[4] Instead of receiving their shares of the proceeds directly, petitioner and Briggs had directed that their checks be made payable to Towers Development.

Also on November 7, 1988, ACT issued separate checks of $66,666.67 to each of its four shareholders, including petitioner.[5]  Therefore, petitioner received from ACT gross distributions aggregating $199,490.01 ($66,666.67 plus $132,823.34).  All these distributions occurred in the State of Florida.

After the initial distribution of the sale proceeds on November 7, 1988, the remaining payments under the purchase agreement were distributed to ACT's shareholders directly.[6]

For taxable year 1988, ACT issued petitioner a Form 1099-DIV, Statement for Recipients of Dividends and Distributions, showing cash liquidating distributions of $80,890.

The sale of ACT's assets to JSL on October 28, 1988, resulted in a complete dissolution or liquidation of ACT's assets, and the subsequent transfers to ACT's shareholders on November 7, 1988, of the cash proceeds that ACT received from the sale of its assets to JSL rendered ACT insolvent.  After selling

---

[5] Thus, Association Cable TV, Inc. (ACT), issued checks to its four shareholders totaling $266,666.68.  From worksheets in evidence, ostensibly prepared by ACT's accountants, it appears that ACT allocated $13,034.93 to pay Hess' legal expenses and $30,000 to pay a commission.  The sum of these total payments and allocated expenses--$309,701.61--is slightly greater than the $309,666.66 payment that Hess made to ACT on Nov. 7, 1988.  The seeming discrepancy is unexplained in the record.

[6] The record does not indicate the exact dates or amounts of these payments.

its assets to JSL, ACT transacted no other business, other than in February 1990 filing its 1988 Federal income tax return.

On its 1988 Federal income tax return, ACT took the position that the $405,776 gain it realized on the sale of its assets to JSL was nontaxable pursuant to section 337 because ACT had adopted a plan of complete liquidation on or before the sale date of the assets. In a notice of deficiency issued to ACT for taxable year 1988, respondent determined that ACT had not timely adopted a plan of liquidation and that the gain was taxable, resulting in an income tax liability for ACT of $136,903. Respondent also determined that ACT was liable for additions to tax of $102,677 under section 6653(b)(1) for fraud and $34,226 under section 6661 for substantial understatement of tax. ACT petitioned the Tax Court.

In Association Cable TV, Inc. v. Commissioner, T.C. Memo. 1995-596, this Court held that ACT was liable for the tax on the gain from the sale of its assets to JSL because no plan of liquidation existed on or before the sale date. The Court also sustained the additions to tax for fraud and for substantial understatement. With respect to the addition to tax for fraud, the Court found that ACT, through the actions of Briggs and petitioner, had falsified documents to corroborate its 1988 Federal income tax return position that the asset sale constituted a nontaxable liquidation pursuant to section 337.

Having determined that the November 1988 distributions to its shareholders left ACT with insufficient funds to pay its 1988 corporate Federal income tax liability, respondent has sought to collect the liability from ACT's shareholders, including petitioner.

## Discussion

### Petitioner's Transferee Liability

Pursuant to section 6901, the Commissioner may proceed against a transferee of property to assess and collect Federal income taxes owed by the transferor. For this purpose, a transferee includes a shareholder of a dissolved corporation. See sec. 301.6901-1(b), Proced. & Admin. Regs. Section 6901 does not impose liability on the transferee but merely gives the Commissioner a procedure or remedy to enforce the transferor's existing liability. See Commissioner v. Stern, 357 U.S. 39, 42 (1958). Respondent bears the burden of proving petitioner's liability as a transferee but not of proving ACT's liability for the tax. See sec. 6902(a); Rule 142(d).

The existence and extent of transferee liability is determined by the law of the State in which the transfer occurred--in this case, Florida. See Commissioner v. Stern, supra at 45; Gumm v. Commissioner, 93 T.C. 475, 479-480 (1989), affd. without published opinion 933 F.2d 1014 (9th Cir. 1991); Fibel v. Commissioner, 44 T.C. 647, 657 (1965).

Respondent argues that under Florida law, petitioner is liable as a transferee both at law and in equity.[7]  On brief, respondent bases his arguments regarding petitioner's liability at law on Florida statutes that were not in effect at the time of the transfers in question.[8]  We need not linger long over this complication, however, for as discussed below, we conclude that respondent has made a prima facie case of transferee liability in equity.

Under Florida law, a transferee may be liable in equity for the debts of the transferor who fraudulently conveys assets to

---

[7] The difference between transferee liability at law and in equity has been described as follows:

> Transferee liability at law is based either on the transferee's express assumption of the transferor's liability (the "assumption by contract" theory) or on state or federal law imposing liability on the transferee.  The difference between liability at law and liability in equity is not that one is based on statutory law while the other is not.  Rather, the difference is that liability in equity derives from the law of fraudulent conveyances developed by courts of equity that required an application for equitable relief where a conveyance was to be set aside.  Much of the law of fraudulent conveyances is now a matter of statute such as the Uniform Fraudulent Conveyance Act. [Saltzman, IRS Practice and Procedure, par. 17.03 (2d ed. 1991)].

[8] On brief, respondent relies on Fla. Stat. Ann. secs. 607.1405(1), 607.1406(10), and 607.1406(12) (West 1993).  These provisions were effective as of July 1, 1990.  The subject matter of the predecessor statutes is similar but not identical to that of the statutes cited by respondent.

the transferee. See <u>Hagaman v. Commissioner</u>, 100 T.C. 180, 188 (1993); <u>Schad v. Commissioner</u>, 87 T.C. 609, 614 (1986), affd. without published opinion 827 F.2d 774 (11th Cir. 1987); <u>Wiltzius v. Commissioner</u>, T.C. Memo. 1997-117. Under Florida's Uniform Fraudulent Transfer Act (UFTA), effective January 1, 1988, a transfer is fraudulent as to present and future creditors if the debtor made the transfer "With actual intent to hinder, delay, or defraud any creditor of the debtor". Fla. Stat. sec. 726.105(1)(a) (1988). The UFTA defines "creditor" as "a person who has a claim", and "debtor" as "a person who is liable on a claim." Fla. Stat. sec. 726.102(4), (6) (1988).

Petitioner concedes that he is precluded from challenging the tax liability of ACT as determined in <u>Association Cable TV, Inc. v. Commissioner</u>, <u>supra</u>. See <u>Krueger v. Commissioner</u>, 48 T.C. 824 (1967) (decisions entered by the Tax Court determining deficiencies against taxpayers are res judicata as to the taxpayers' liabilities in a later action involving transferee liability). Petitioner does not dispute that respondent has failed to collect the liability from ACT. Petitioner does not dispute that he was an initial transferee of ACT and that as a result of the distributions of November 7, 1988, he received gross proceeds of $199,490. The critical question is whether ACT made the transfers to petitioner with fraudulent intent.

The UFTA specifies a number of factors that may be considered in determining whether the debtor made transfers, or incurred obligations, with intent to hinder, delay, or defraud a creditor.[9]  Among these factors are:  (1) Whether the transfer

---

[9] Fla. Stat. sec. 726.105(2) (1988) provides:

In determining actual intent under paragraph (1)(a), consideration may be given, among other factors, to whether:

(a) The transfer or obligation was to an insider.

(b) The debtor retained possession or control of the property transferred after the transfer.

(c) The transfer or obligation was disclosed or concealed.

(d) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.

(e) The transfer was of substantially all the debtor's assets.

(f) The debtor absconded.

(g) The debtor removed or concealed assets.

(h) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.

(i) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

(j) The transfer occurred shortly before or shortly after a substantial debt was incurred.

(k) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

was to an insider; (2) whether the transfer was of "substantially all" the debtor's assets; (3) whether the debtor was insolvent or became insolvent shortly after the transfer was made; and (4) whether the transfer was made shortly before or after a substantial debt was incurred.  Fla. Stat. sec. 726.105(2)(a), (e), (i), (j) (1988).  As discussed below, all these factors indicate fraudulent intent in the instant case.

1.  Whether the Transfer Was to an Insider

In the case of a corporation, an "insider" includes a director or an officer of the corporation.  Fla. Stat. sec. 726.102(7)(b) (1988).  The parties have stipulated that petitioner was a shareholder, director, and officer of ACT. "In Florida, existing creditors have the benefit of a presumption of fraudulent intent where the conveyance is voluntary and there is a close relationship between the transferor and the transferee."  Hagaman v. Commissioner, supra at 188; see Scott v. Dansby, 334 So. 2d 331, 333 (Fla. Dist. Ct. App. 1976).[10]

---

[10] Hagaman v. Commissioner, 100 T.C. 180 (1993), was decided under Fla. Stat. sec. 726.01, which was repealed and replaced by provisions of the UFTA, effective Jan. 1, 1988.  Scott v. Dansby, 334 So. 2d 331 (Fla. Dist. Ct. App. 1976), was decided under Florida law governing fraudulent conveyances, which was codified in Fla. Stat. sec. 726.01 (1988).  Unless displaced by the express provisions of the new act, the principles, law, and equity under Fla. Stat. 726.01 remain intact and supplement the provisions of the UFTA.  See Fla. Stat. sec. 726.111 (1988); Advest, Inc. v. Rader, 743 F. Supp. 851, 854 n.9 (S.D. Fla. 1990).

2.   Whether the Transfer Was of "Substantially All" the
     Debtor's Assets

Under the terms of the purchase agreement, ACT was to sell
all its tangible and intangible assets to JSL.  The sale resulted
in a complete dissolution or liquidation of ACT's assets.  After
the sale, ACT conducted no other business, except for filing its
1988 Federal income tax return.  On November 7, 1988, ACT
distributed the cash proceeds from the sale to the shareholders.
We conclude that on November 7, 1988, ACT transferred
"substantially all" its assets to its shareholders.  See General
Trading, Inc. v. Yale Materials Handling Corp., 119 F.3d 1485,
1500 (11th Cir. 1997).[11]

3.   Whether the Debtor Was Insolvent or Became Insolvent
     Shortly After the Transfer Was Made

The parties have stipulated that ACT was rendered insolvent
by ACT's sale of its assets to JSL on October 28, 1988, and ACT's
subsequent transfer to its shareholders on November 7, 1988.

---

[11] In Association Cable TV, Inc. v. Commissioner, T.C. Memo.
1995-596, this Court stated that "the sale of ACT's assets to JSL
did not constitute a sale of ACT's sole asset because ACT still
had outstanding contracts."  The relevant consideration under
Fla. Stat. sec. 726.105(2)(e) (1988), however, is not whether ACT
sold all its assets to JSL, but whether ACT transferred
"substantially all" its assets to its shareholders.  See General
Trading, Inc. v. Yale Materials Handling Corp., 119 F.3d 1485,
1500 (11th Cir. 1997).  As discussed above, the facts in the
record of the instant proceeding indicate that ACT transferred
substantially all its assets to its shareholders, including
petitioner.  Petitioner has adduced no evidence to the contrary.

   4.  Whether the Transfer Was Made Shortly Before or Shortly
       After a Substantial Debt Was Incurred

ACT transferred assets to petitioner shortly after it sold its assets to JSL and shortly before it incurred the related tax liabilities.  See Hagaman v. Commissioner, 100 T.C. at 188 (regardless of when Federal taxes are actually assessed, taxes are due and owing, and constitute a liability, no later than the date the tax return for the particular period is required to be filed); Yagoda v. Commissioner, 39 T.C. 170, 185 (1962) (transferee is liable for all existing debts of the transferor, "whether or not such debts had been determined, or were even known at that time"), affd. 331 F.2d 485 (2d Cir. 1964).

Although a single factor considered in isolation may not establish the requisite fraud to set aside a conveyance, several of them considered together may afford a basis to infer fraud. See Johnson v. Dowell, 592 So. 2d 1194, 1197 (Fla. Dist. Ct. App. 1992).  On the basis of the several factors discussed above, and after considering all the evidence in the record, we conclude that respondent has established a prima facie case that ACT made the transfers in question with fraudulent intent.  Petitioner bears the burden of rebutting the presumption.  See Hagaman v. Commissioner, supra at 189; Nau v. Commissioner, 27 T.C. 999, 1000-1001 (1957), affd. in part and revd. in part on another ground 261 F.2d 362 (6th Cir. 1958); Gobins v. Commissioner, 18 T.C. 1159, 1169 (1952), affd. per curiam 217 F.2d 952 (9th Cir.

1954); Advest, Inc. v. Rader, 743 F. Supp. 851, 854 (S.D. Fla. 1990).

On reply brief, petitioner states that he does not contest the receipt of $199,490 but argues that no more than $103,017 of this amount represents a transfer from ACT, because: (1) Petitioner had $13,873 of expenses associated with the sale of ACT's assets to JSL, and (2) $82,600 was paid to petitioner for his entering into a covenant not to compete with JSL.[12]

_____

[12] On opening brief, petitioner argues that ACT should be treated as having transferred to him no more than $67,017, an amount arrived at by subtracting from $199,490 not only his $13,873 of alleged sales expenses incurred and the $82,600 associated with the covenant not to compete, but also $36,000 that he alleges represented repayment of a loan by ACT. Petitioner provides no explanation for the discrepancy in his positions on opening and reply brief. We consider petitioner to have abandoned his argument regarding ACT's alleged repayment of a loan to petitioner. This conclusion is consistent with petitioner's concession in Briggs v. Commissioner, T.C. Memo. 2000-380, that the full $199,490 is includable in his gross income.

In any event, the evidence does not establish the existence of any loan from petitioner to ACT or that petitioner received the transferred assets in any capacity other than as a shareholder of ACT. The only documentary evidence offered by petitioner to establish the existence of loans to ACT was a handwritten worksheet, apparently prepared by ACT's accountants, which indicates that $36,000 of the $199,490 transferred to each of ACT's four shareholders, including petitioner and John L. Daniell (Daniell), represented "Loan Reductions". Petitioner offered no evidence to corroborate either the worksheet or ACT's alleged indebtedness to him. To the contrary, Daniell testified that he could not recall whether he or the other shareholders had ever made any loans to ACT. Also, ACT's 1988 Federal income tax return reflects no loans from shareholders. Petitioner has failed to overcome the prima facie showing by respondent that ACT's transfers to petitioner included the $36,000 in question.

(continued...)

1.  Claimed Selling Expenses

Petitioner argues that $13,873 of claimed selling expenses should be netted from the gross amounts transferred to him by ACT.  The record is largely silent about these claimed selling expenses, who incurred them, when, or why.  Petitioner's position here is inconsistent with his concession in Briggs v. Commissioner, T.C. Memo. 2000-380, that the full $199,490 is includable in his gross income.  In Briggs, petitioner did not claim any deduction or offset for the $13,873 of claimed selling expenses.  As previously noted, petitioner has agreed to be bound by the record compiled in Briggs.  Petitioner has failed to establish his entitlement to any offset for selling expenses here.

2.  Amounts Attributable to Covenant Not To Compete

Petitioner argues that $82,600 of the transfers in question, representing one-fourth of the $330,400 initial payment from JSL with respect to the $500,000 agreed-upon consideration for the covenant not to compete, represents his own income rather than a transfer from ACT.  We disagree.

The UFTA defines "Transfer", in relevant part, as "every mode, direct or indirect, * * * of disposing of or parting with

[12](...continued)
See Powers Photo Engraving Co. v. Commissioner, 17 T.C. 393 (1951), remanded on other grounds 197 F.2d 704 (2d Cir. 1952); Griffiths v. Commissioner, T.C. Memo. 1994-637.

an asset <u>or an interest in an asset</u>".  Fla. Stat. sec.
726.102(12) (1988) (emphasis added).  As a party to the covenant
not to compete, ACT clearly had an interest in the proceeds
therefrom, which the parties have stipulated were part of the
total purchase price paid for ACT's assets.  Petitioner has not
established that ACT had no interest in the entire $330,400
partial payment it received from JSL, or that its transfer to
petitioner of a one-fourth share of these proceeds did not
constitute a transfer from ACT within the meaning of the UFTA.

<u>Whether the Full Amount of ACT's Deficiency Has Been Paid</u>

On brief, petitioner argues for the first time that he
should not be liable for ACT's deficiency because it has already
been discharged by other transferees.  Generally, we will not
consider positions raised for the first time on brief if to do so
would prejudice the opposing party.  See <u>Leahy v. Commissioner</u>,
87 T.C. 56, 64-65 (1986).  In the instant circumstances, however,
we believe it is appropriate to address petitioner's argument.

As a general principle, the Commissioner can collect the
transferor's tax liability only once; where it is shown that the
full amount of the deficiency has been paid, the liability of the
transferee is extinguished.  See <u>Holmes v. Commissioner</u>, 47 T.C.
622, 627 (1967); <u>Quirk v. Commissioner</u>, 15 T.C. 709 (1950), affd.
per curiam 196 F.2d 1022 (5th Cir. 1952).  Once the Commissioner
has met his burden of proof under section 6902(a) and established

a prima facie case for transferee liability, the burden of going forward devolves upon the transferee to establish defenses thereto, such as payment of the transferor's liability by or on behalf of the transferor.  See Estate of McKnight v. Commissioner, 8 T.C. 871, 873 (1947); Newsome v. Commissioner, T.C. Memo. 1976-75.

On brief, petitioner states without elaboration that he "has * * * learned that the Estate of Gay has also paid its liability emanating from the Associated [sic] Cable TV, Inc. distribution." The record is devoid of evidence, however, of any such payment by the Estate of Gay, or when, how, or for what purpose it might have been made.

Daniell testified that he has paid approximately $113,000 in satisfaction of a transferee liability claim asserted against him by the Internal Revenue Service (IRS).  Assuming arguendo that Daniell made this payment, it is insufficient to satisfy the full amount of ACT's liability.[13]  Moreover, so long as the possibility exists that Daniell could file for a refund, petitioner cannot be exonerated from transferee liability.  See Holmes v. Commissioner, supra; Peterson v. Commissioner, T.C.

---

[13] This Court has determined that ACT owed a tax liability of $136,903, an addition to tax for fraud of $102,677, and a substantial understatement penalty of $34,226, for a total of $273,806.  See Association Cable TV, Inc. v. Commissioner, T.C. Memo. 1995-596.  This amount does not take into account any interest on ACT's taxable year 1988 liability.  See secs. 6602, 6622.

Memo. 1972-65. Barring refund claims by Daniell or other transferees who may have made payments against ACT's tax liability, however, we expect respondent to take any such payments into account in computing petitioner's ultimate liability. See Peterson v. Commissioner, supra.

Transferee Liability for Addition to Tax for Fraud

On brief, petitioner argues that because respondent has failed to prove petitioner's fraud with clear and convincing evidence, petitioner has no transferee liability for ACT's addition to tax for fraud. Petitioner's argument betrays a fundamental misunderstanding of transferee liability. Section 6901 provides the Commissioner a mechanism for collecting a transferor's tax liability, which may be either as to the amount of tax shown on the transferor's return or as to any deficiency or underpayment of tax by the transferor. See sec. 6901(b). The additions to tax, such as the section 6653(b) addition to tax for fraud, are assessed and collected in the same manner as taxes, and the term "tax" as used in the Internal Revenue Code specifically includes, among other things, the section 6653(b) addition to tax for fraud. Sec. 6662(a).

Accordingly, petitioner's liability as a transferee of ACT extends to ACT's liability for the addition to tax for fraud as determined in Association Cable TV, Inc. v. Commissioner, T.C.

Memo. 1995-596.  See <u>Bowlin v. Commissioner</u>, 31 T.C. 188 (1958),
affd. per curiam 273 F.2d 610 (6th Cir. 1960).

<u>Statute of Limitations</u>

Petitioner argues that respondent is time barred from
asserting liability against petitioner as a transferee.

A transferee's liability, at law or in equity, for Federal
income tax generally must be assessed and collected in the same
manner as the transferor's liability.  See sec. 6901(a)(1)(A)(i).
In the case of the liability of an initial transferee, however,
the statute of limitations extends 1 year after the limitations
period for assessing tax against the transferor.  See sec.
6901(c).  Petitioner concedes that he is an initial transferee of
ACT.

As a general rule, the limitations period for assessing
taxes against the transferor is 3 years from the date the return
is filed.  See sec. 6501(a).  In the case of a false or
fraudulent return with the intent to evade tax, however, the
general rule is inapplicable, and the IRS may assess or collect
the tax anytime.  See sec. 6501(c)(1); <u>DiLeo v. Commissioner</u>, 96
T.C. 858, 880 (1991), affd. 959 F.2d 16 (2d Cir. 1992).

This Court previously has determined that ACT is liable for
the addition to tax for fraud with respect to taxable year 1988.
See <u>Association Cable TV, Inc. v. Commissioner</u>, <u>supra</u>.  This
holding is conclusive that at least part of the deficiency was

attributable to fraud; consequently, ACT's 1988 Federal income tax return was false and fraudulent. See Forehand v. Commissioner, T.C. Memo. 1993-618. On brief, petitioner concedes that he is collaterally estopped from challenging the decision in Association Cable TV, Inc. Accordingly, because no statute of limitations bars assessment against ACT, none bars assessment against petitioner. See Pert v. Commissioner, 105 T.C. 370, 378 (1995); Bartmer Automatic Self Serv. Laundry v. Commissioner, 35 T.C. 317, 322 (1960).

Petitioner argues that the Florida limitations period is applicable and bars respondent from proceeding against petitioner. Petitioner's argument is without merit. "It is well settled that the United States is not bound by state statutes of limitation * * * in enforcing its rights." United States v. Summerlin, 310 U.S. 414, 416 (1940); see United States v. Fernon, 640 F.2d 609, 612 (5th Cir. 1981) (Florida statute of limitations did not apply); United States v. West Tex. State Bank, 357 F.2d 198, 201 (5th Cir. 1966); Bresson v. Commissioner, 111 T.C. 172, 184 (1998), affd. 213 F.3d 1173 (9th Cir. 2000). Although State law determines the nature and extent of property rights in applying a Federal revenue act, Federal law determines the consequences of those rights. See United States v. National Bank of Commerce, 472 U.S. 713, 722-723 (1985); Bresson v. Commissioner, supra at 189.

Accordingly, we hold that respondent is not time barred from assessing transferee liability against petitioner.

Conclusion

Petitioner is liable as a transferee for ACT's income tax deficiencies and additions to tax up to, but not exceeding, $199,490, plus interest, for the tax liabilities due and uncollected from ACT for the 1988 taxable year.[14]

To reflect the foregoing,

Decision will be entered

under Rule 155.

---

[14] The parties have not addressed the manner in which interest is to be computed. We expect this matter to be resolved in the Rule 155 computation. For an analysis of the computation of interest under Florida law where the amount transferred to a transferee is less than the amount of taxes owed by the transferor, see Griffin v. Commissioner, T.C. Memo. 1997-394.